[No. D032696. Fourth Dist., Div. One. June 23, 2000.]

PATRICIA DOLAN-KING, Plaintiff and Respondent, v.
RANCHO SANTA FE ASSOCIATION et al., Defendants and Appellants.

COUNSEL

Horvitz & Levy, Barry R. Levy, Daniel J. Gonzalez; Musick, Peeler & Garrett and Gary L. Wollberg for Defendants and Appellants.

David A. Niddrie; Garrison & McInnis, Donald E. McInnis and Robert R. Massey for Plaintiff and Respondent.

OPINION

O'ROURKE, J.—After the Board of Directors (the Board) of the Rancho Santa Fe Association (the Association), on the advice of a five-person "Art Jury," rejected Patricia Dolan-King's proposed plans for home additions and

a perimeter fence on her property, Dolan-King sued the Association seeking a declaration that its actions were invalid. Following a bench trial, the court declared the Association's rejection of the plans arbitrary and an "abuse of power" and entered judgment in Dolan-King's favor. The Association appeals, claiming the court misinterpreted the protective covenant governing land use and aesthetic standards for Dolan-King's property, improperly substituted its own judgment for that of the Association and Art Jury and failed to exercise the proper judicial deference for the Association's aesthetic decisions.

We conclude the relevant provisions of the protective covenant are enforceable equitable servitudes, and, with regard to Dolan-King's improvement applications, Dolan-King failed to meet her burden to show the Board's decisions were unreasonable and arbitrary under the circumstances. Accordingly, we reverse the judgment and order and direct the court to enter judgment for the Association.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1996, Dolan-King purchased a home on an approximately three-acre lot in the residential community of Rancho Santa Fe. Development in Rancho Santa Fe is subject to the Rancho Santa Fe Protective Covenant (Covenant), which was adopted and recorded in 1928 and amended at various times over the years. Declaring that "Rancho Santa Fe is unusually attractive and valuable as a high class place of residence because of the rare quality of its landscape, trees and shrubs and the fine architecture and other improvements established by its property owners," the Covenant recognizes the Rancho Santa Fe property owners' desire of "preserving, continuing and maintaining the character of community and rare landscape features and of upholding the quality of all future architecture and improvements, and of restricting the use, height and bulk of buildings . . ." To that end, the Covenant not only contains express restrictions on such things as height requirements and building setbacks, but it also requires that property improvements and structures be approved by the Association with the written advice of the Rancho Santa Fe Art Jury (the Art Jury) "so as to insure a uniform and reasonably high standard of artistic result and attractiveness in exterior and physical appearance of said property and improvements."[1] The Covenant charges the Association and the Art Jury with power to interpret and enforce its provisions.

---

[1]Article III of the Covenant sets forth the Art Jury's duties and functions, which include approval of land development and subdivisions, "examination, correction, approval or rejection" of building plans and specifications, and approval of works of art. Specifically, paragraph 46, section 1, provides: "No part of the said property and/or of any property at any time within the jurisdiction of the Art Jury or of the Association shall be subdivided, laid out or improved by buildings, or structures, or its physical contours altered or changed, except in

Article IV of the Covenant establishes three "Architecture Districts" within Rancho Santa Fe, and sets forth general requirements to which buildings or structures "shall" conform, "subject to the discretion of the Art Jury." Article IV, section 28, entitled "General Requirements as to Architecture," provides: "To preserve the attractiveness of the said property and to prevent the erection, alteration or maintenance of buildings of undesirable and inharmonious design that would depreciate neighboring property, there are hereby established and defined for said property certain districts combining the usual architectural forms as follows: [¶] Type I—Architecture Districts. [¶] Type II—Architecture Districts. [¶] Type III—Architecture Districts. . . . No building or structure shall be erected, constructed altered or maintained on said property or any part thereof, except in conformity with the regulations herein provided for the Type of Architecture District in which said building or structure is located. . . . [¶] (c) Materials, color and forms must be used honestly, actually expressing what they are, and not imitating other materials (such as tin, tile, wood and sheet metal, shamming stone, etc.) . . . In this hilly country, roofs will be much seen from above, and their form and color are important to the success and attractiveness of the property. The design of the building must be such as will, in the opinion of the Art Jury, be reasonably appropriate to its site and harmonize with its surroundings. The word 'type' is used rather than 'style' because attempts to reproduce 'archaeological' or 'period' styles shall be discouraged.

Dolan-King's home was within the Type I Architecture District, described in the Covenant as "that distinctive type of architecture which for several decades has been successfully developing in California, deriving its chief inspiration directly or indirectly from Latin types, which developed under similar climatic conditions along the Mediterranean or at points in California, such as Monterey."

Dolan-King was drawn to Rancho Santa Fe because she "wanted to live in the Covenant." She was aware of the Covenant's existence and had "read over it" before she agreed to purchase the house. Dolan-King testified she liked the house and was "really excited" by the fact it was in the Covenant. However, she desired to make some changes, and through architects Dolan-King submitted to the Art Jury plans for a new perimeter fence as well as "turret-style" additions to her living and family rooms. In place of the original three-rail corral-type fence on her property when she purchased it,

---

preparing land for orchard or farm use, except with the approval of the Association with the written advice of the Art Jury so as to insure a uniform and reasonably high standard of artistic result and attractiveness in exterior and physical appearance of said property and improvements." The Association's bylaws make clear that the Board's approval of subdivisions and structures is invalid unless it has first received the written advice of the Art Jury.

she proposed a fence composed of stucco columns (pilasters) joined by horizontal wood beams. The proposed room addition structures were designed with large windows and French doors wrapped around their upper and lower levels to provide increased natural lighting as well as views north and east of her house.

The Art Jury denied Dolan-King's applications. It found her proposed fence designs inconsistent with the Rancho Santa Fe Residential Design Guidelines (Guidelines),[2] the desired rural community character and the existing neighborhood character. It suggested, as an "aesthetic alternative" in response to Dolan-King's concern about containing her pets, placing wire mesh on the inside face of the corral fence. As for Dolan-King's proposed room additions, the Art Jury found the designs "not in keeping with Paragraph 46" of the Covenant. The Art Jury stated the turret-style additions would be acceptable if Dolan-King decreased the proportion of window to stucco mass[3] in a manner similar to examples presented to them by her architect, and suggested she reevaluate that as well as the thickness of the walls and size and quantity of the windows.

Following unsuccessful mediations attended by Dolan-King's attorney and architect,[4] Dolan-King appealed the Art Jury's decisions to the Board. The Covenant vests the Board with authority to modify the Art Jury's decisions in cases where four-fifths of the Board finds the Art Jury's decision "works an undue hardship" on the petitioner; modification of the Art Jury's decision "will not tend unduly to lower the standards of attractiveness of the surrounding property or depreciate the neighborhood"; or there was "bias or prejudice on the part of one or more members of the Art Jury as to said decision or ruling." The Board unanimously upheld the Art Jury's decisions.

---

[2]The Association's board of directors adopted and published the Guidelines in June 1991 with a stated goal to "produce a Board-Adopted document, for use by builders, members, decisionmakers and staff, which will guide residential development so that future approvals will work to maintain the traditional character of Rancho Santa Fe . . . ." The Guidelines contain numerous specific examples and pictures of design principles that "increase the probability" of permit approval. For example, the Guidelines state that "appropriate fence types are: two or three rail pasture style post and rail, peeler log and other pasture types which reflect the rural character of the community." The Board acknowledged to homeowners that the Guidelines were not controlling, and that the Association had the right under the Covenant to evaluate land use and building applications by standards other than those contained in the Guidelines. The parties apparently stipulated the provisions of the Covenant controlled over those contained in the Guidelines.

[3]The arrangement, positioning and design of windows and doors in a building is referred to as "fenestration." (Webster's 10th Collegiate Dict. (1997) p. 429.)

[4]Dolan-King's attorney attended the mediation over the fence design, at which he presented a revised design containing vertical wrought iron pickets and railing. The Art Jury rejected the revised proposal as too similar to the original proposal.

Dolan-King filed suit against the Association, its board of directors and the Art Jury seeking a judicial determination of the validity and enforceability of the Guidelines and the criteria and restrictions used by the Art Jury to reject her applications. She asked the court to resolve whether the Guidelines and various provisions of the Covenant were applied arbitrarily and unreasonably; whether the defendants' land use planning was arbitrary, capricious and unreasonable; and whether the defendants exceeded their authority under the Covenant and breached their contractual and fiduciary duties to the Association's members.

Following the presentation of evidence and written arguments, the court rendered its intended statement of decision in Dolan-King's favor. It found the Association and Art Jury's decisions rejecting her applications "failed the rational relationship test and constituted an abuse of power." Specifically, it concluded: (1) Board approval of Dolan-King's applications would not violate paragraph 46 of the Covenant, requiring that the Art Jury ensure "a uniform and reasonably high standard of artistic result and attractiveness, in exterior and physical appearances" of the property and improvements; (2) Dolan-King's fence plans should have been approved by the Art Jury and Board because (a) the proposed fence type was "consistent with the type of architecture required by the Covenant," (b) the Board and Art Jury's decisions were improperly based on Guidelines that were without "controlling effect," and (c) the fence could be masked by appropriate landscaping; and (3) The Covenant required the Art Jury and Board to approve any fenestration plan "consistent with the required style of architecture that was not aesthetically displeasing," and the turrets were not at all or barely visible from the street. After the Association unsuccessfully objected to the court's intended statement of decision, the court deemed the intended statement of decision final and entered judgment for Dolan-King. It awarded Dolan-King attorney fees in the amount of $187,677.

### DISCUSSION

### I. *Standard of Review*

We first address the proper standard for our review of the court's judgment. The Association contends we must act "independently of the trial court" and review the Board and Art Jury's decisions "in the light most favorable to the decision to deny approval," giving deference to the Board's decision analogous to review of decisions of governmental agencies on petition for writ of mandate. It urges we follow the "rule of judicial deference" to community association board decisionmaking set out by the California Supreme Court in *Nahrstedt v. Lakeside Village Condominium*

*Assn.* (1994) 8 Cal.4th 361, 374 [33 Cal.Rptr.2d 63, 878 P.2d 1275] (*Nahrstedt*) and more recently in *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 253 [87 Cal.Rptr.2d 237, 980 P.2d 940] (*Lamden*). Dolan-King relies upon *Clark v. Rancho Santa Fe Assn.* (1989) 216 Cal.App.3d 606, 619 [265 Cal.Rptr. 41] (*Clark*) to argue we must presume the court's judgment to be correct, view the evidence in the light most favorable to the judgment and simply determine whether substantial evidence supports the trial court's conclusions. However, as Dolan-King acknowledges, *Clark* differs from this case in that it involved a referee's review of the Association's denial of a subdivision proposal under a petition for writ of mandamus. (*Id.* at p. 613.) The sole issue before the referee in *Clark* was whether substantial evidence supported the Association and Art Jury's subjective conclusions about the adequacy of the proposal, not, as here, whether the Association acted under enforceable restrictions, beyond its authority or in a discriminatory manner. (*Id.* at p. 615.) ■ It is settled that in reviewing a trial court's ruling on a writ of mandate (Code Civ. Proc., § 1085), the appellate court is "ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial evidence. [Citation.]" (*Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 700 [41 Cal.Rptr.2d 352].) The standard does not apply where the facts below are undisputed. (*Ibid.*)

■ Dolan-King's complaint was for declaratory relief. Whether a determination is proper in an action for declaratory relief is a matter within the trial court's discretion and the court's decision to grant or deny relief will not be disturbed on appeal unless it is clearly shown its discretion was abused. (*Hannula v. Hacienda Homes* (1949) 34 Cal.2d 442, 448 [211 P.2d 302, 19 A.L.R.2d 1268].) Here, however, the decisive underlying facts, primarily Dolan-King's proposed designs and the Art Jury and Board's actions, are undisputed. In such a case, in reviewing the propriety of the trial court's decision, we are confronted with questions of law. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 [35 Cal.Rptr.2d 418, 883 P.2d 960]; *Caloca v. County of San Diego* (1999) 72 Cal.App.4th 1209, 1217 [85 Cal.Rptr.2d 660].) Moreover, to the extent our review of the court's declaratory judgment involves an interpretation of the Covenant's provisions, that too is a question of law we address de novo. (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 71 [56 Cal.Rptr.2d 723]; *Clark, supra,* 216 Cal.App.3d at pp. 618-619 [resolving as a matter of law whether the language of the Covenant permits the Association and Art Jury to use subjective criteria in judging property owners' applications to improve their property].)

## II. *Enforceability of the Provisions of the Covenant and Residential Design Guidelines*

### A. *The Covenant's Provisions*

The court framed the issues at trial as follows: "1. What type of perimeter fence can be legally required to be in compliance with the requirements of the [Covenant] and 2. What type of fenestration . . . on the two proposed turret additions can be legally required to be in compliance with the requirements of the Covenant?" Although it acknowledged Dolan-King sought a declaration of the validity of the criteria and Guidelines applied by the Art Jury and Board, the court did not directly address the enforceability of the Covenant's provisions or the Guidelines relied upon by those entities in denying her applications. The determination was a necessary prerequisite to decide whether the Board exceeded its authority and acted reasonably, and the court erred by ignoring the issue. However, on this record, we may address the reasonableness of the relevant provisions as a matter of law. (See, e.g., *Liebler v. Point Loma Tennis Club* (1995) 40 Cal.App.4th 1600 [47 Cal.Rptr.2d 783].)

■ Interpreting and applying the language of Civil Code section 1354,[5] the California Supreme Court has made it clear that restrictions on the use of property contained in covenants recorded with the county recorder are "presumed to be reasonable and will be enforced uniformly against all residents of the common interest development *unless* the restriction is arbitrary, imposes burdens on the use of lands it affects that substantially outweigh the restriction's benefits to the development's residents, or violates a fundamental public policy." (*Nahrstedt, supra,* 8 Cal.4th at p. 386; *Lamden, supra.,* 21 Cal.4th at p. 263.) Such deference to the originating covenants, conditions and restrictions " 'protects the general expectations of condominium owners "that restrictions in place at the time they purchase their units will be enforceable." ' " (*Lamden, supra*, 21 Cal.4th at p. 264.) Restrictions are evaluated for reasonableness in light of "the restriction's effect on the project as a whole," not from the perspective of the individual homeowner. (*Nahrstedt, supra*, 8 Cal.4th 361, 386; *Liebler v. Point Loma Tennis Club, supra* 40 Cal.App.4th at pp. 1606, 1611.) Accordingly, courts do not conduct a case-by-case analysis of the restrictions to determine the effect on an individual homeowner; we must consider the reasonableness of the restrictions by looking at the goals and concerns of the entire development.

---

[5]Civil Code section 1354, subdivision (a) provides: "The covenants and restrictions in the declaration shall be enforceable equitable servitudes, unless unreasonable, and shall inure to the benefit of and bind all owners of separate interests in the development. Unless the declaration states otherwise, these servitudes may be enforced by any owner of a separate interest or by the association, or by both."

■ In her briefs before the trial court, Dolan-King did not challenge the Covenant's broad governing provisions expressing an intent to preserve the value and attractiveness of Rancho Santa Fe, and giving the Art Jury and Association authority and duty to enforce and interpret the Covenant's provisions. Rather, she contended the Guidelines followed by the Art Jury were not contained in the Covenant, and that paragraphs 46 and 47 of the Covenant did not empower the Art Jury to deny her applications, but only enabled it to exercise discretion in approving "color," "texture and finish of plaster or exterior" and "roofing materials" under other provisions of the Covenant.

We reject Dolan-King's narrow interpretation of the Covenant. This court held in *Clark, supra,* 216 Cal.App.3d 606, that reading the Covenant as a whole, the Art Jury and Board are empowered to render judgments on property improvement applications based upon subjective as well as objective criteria. (*Id.* at pp. 618-619.) We noted the Covenant's stated goal of a " 'uniform and reasonably high standard of artistic result and attractiveness, in exterior and physical appearance of said property and improvements' " and its "purpose . . . as protecting the attractiveness and value of the area as 'a high class place of residence.' " (*Id.* at p. 618.) Our decision in *Clark* recognized that the Covenant expressly grants the Association and Art Jury broad authority to apply standards that are inherently subjective and by their nature cannot be measured or quantified: "Necessarily, any such evaluations of a property owner's proposal for compatibility with these desired environmental qualities must be done on a subjective basis, as 'attractiveness' and 'artistry' are, like beauty, well within the eye of the beholder. Such qualities have never been measurable or quantifiable." (*Id.* at p. 619, fn. omitted.)

Implicit in our holding in *Clark* is that the Covenant's grant of authority to the Art Jury to make subjective aesthetic judgments is not wholly arbitrary. A restriction is arbitrary when it bears "no rational relationship to the protection, preservation, operation or purpose of the affected land." (*Nahrstedt, supra,* 8 Cal.4th at p. 381.) It is clear even from Dolan-King's own briefs and testimony that one of the desirable aspects of living "in the Covenant" is the concern and control exercised by the Association over style and presentation of the homes as well as the surrounding properties. Maintaining a consistent and harmonious neighborhood character, one that is architecturally and artistically pleasing, confers a benefit on the homeowners by maintaining the value of their properties. Given the Covenant's unambiguous intent to ensure relatively consistent architectural styles and a valuable, aesthetically appealing, high quality neighborhood for the collective benefit of the Rancho Santa Fe homeowners, we conclude the Covenant's grant of broad authority and discretion in the Art Jury to apply

subjective aesthetic criteria is reasonable. Nor do we find the Covenant's provisions violative of fundamental public policy or disproportionately burdensome. (*Id.* at p. 382.) Thus, its general restrictive provisions, reviewed and agreed to by Dolan-King before she purchased her property, are enforceable equitable servitudes. California and many other jurisdictions have long upheld such general covenants vesting broad discretion in homeowners associations or boards to grant or withhold consent to construction. (*Palos Verdes Homes Assn. v. Rodman* (1986) 182 Cal.App.3d 324, 328 [227 Cal.Rptr. 81], citing *Hannula v. Hacienda Homes, Inc., supra,* 34 Cal.2d 442; *Riss v. Angel* (1997) 131 Wn.2d 612 [934 P.2d 669, 677] [citing numerous cases].) This is so even when the covenants contain such broad, general approval standards as " ' "conformity and harmony of external design and general quality with the existing standards of the neighborhood" ' " and " ' "location of the building with respect to topography and finished ground elevations" ' " as long as the covenants clearly granted such discretion. (*Riss v. Angel, supra,* 934 P.2d at p. 677, citing *Winslette v. Keeler* (1964) 220 Ga. 100 [137 S.E.2d 288, 289-290] [the only limitation on a grantor's right to reject plans under such standards is that the right must be exercised reasonably and in good faith].)

B. *The Guidelines*

 We view the Guidelines differently. There is no evidence Dolan-King had notice of the unrecorded Guidelines at the time she purchased her property.[6] Thus, we do not, nor does the Association ask us to, treat them as equitable servitudes. (*Nahrstedt, supra,* 8 Cal.4th at p. 375 ["Restrictions that do not meet the requirements of covenants running with the land may be enforceable as equitable servitudes provided the person bound by the restrictions had notice of their existence."].) In *Lamden,* the court noted a distinction between originating covenants and "subsequently promulgated" unrecorded use restrictions, stating the factors justifying deference to founding covenants are not necessarily present when a court considers subsequent unrecorded community association board decisions. (*Lamden, supra,* 21 Cal.4th at p. 264.) In *Nahrstedt,* the court suggested that such unrecorded restrictions are not accorded a presumption of reasonableness, but are viewed under a straight reasonableness test "so as to 'somewhat fetter the discretion of the board of directors.' " (*Nahrstedt, supra,* 8 Cal.4th at p. 376, quoting *Hidden Harbour Estates v. Basso* (Fla.Dist.Ct.App. 1981) 393 So.2d 637, 640.) We understand this distinction to primarily impact the respective burdens of proof at trial.

---

[6]Dolan-King testified she was not aware of the existence of the Guidelines until after she submitted her plans to the Art Jury and her attorney purchased a copy of the Guidelines during the mediation over her fence.

The Guidelines themselves do not purport to be strict restrictions on improvements or land use. They are intended to "disseminate[] the site and design standards which the community holds as necessary to preserve community character; articulate[] the policies and goals by which the Association judges and regulates land use; and give[] a clear indication of those site and design principles which increase the probability of the issuance of Association permits." They state: "These are general guidelines, and the Art Jury and Association Board may exercise the full breadth of their discretion in considering any land use proposal. The Association has the express right under the Protective Covenant to evaluate land use and building applications by standards other than those contained herein." As a further indication that the Guidelines themselves are not intended as regulations, the Guidelines separately list in an appendix the "regulations on building and land improvement" adopted by the Association.

While we recognize that the Guidelines are not equitable servitudes, we find nothing inherently unreasonable about the Guidelines in and of themselves. They are the Association's attempt to give property owners guidance, by way of detailed examples and explanation, on the criteria used by the Art Jury and Board in reviewing proposed improvements and exercising their broad discretion under the Covenant. The Board's desire to give property owners more concrete examples of how the Art Jury is likely to exercise its broad discretion is entirely legitimate and fair, even though the Guidelines are not binding restrictions. That Dolan-King lacked notice of the Guidelines does not affect their reasonableness, but may influence our determination of whether the Board fairly and reasonably relied upon them to deny Dolan-King's fence application, which we address below.

### III. Validity of the Art Jury and Board's Exercise of Discretion in Denying Dolan-King's Applications

■ The Association contends the court erred by failing to exercise deference to the Board's decisionmaking authority under Lamden, supra, 21 Cal.4th at page 265 and in substituting its own judgment based upon its own evaluation of Dolan-King's applications, including its conclusion Dolan-King's room additions should have been approved because they were not "aesthetically displeasing." According to the Association, as long as the record demonstrates a good faith and rational effort by the Board to further the purpose of the development, the court must uphold its decision. Dolan-King, on the other hand, argues the Board's decisions are not entitled to deference under Lamden because the record shows they were made without reasonable investigation, in bad faith, and in disregard of the best interests of the community association and its members.

We agree the court failed to apply the proper deferential standard to test the Board's exercise of discretion. ■ In *Lamden*, the California Supreme Court held that courts should defer to the discretionary decisions of duly constituted community associations in exercising their obligations to maintain and repair common areas, where those decisions are made within the scope of their authority under relevant statutes, covenants, and restrictions, upon reasonable investigation, in good faith, and in a manner in the best interests of the Association and its members. (*Lamden, supra*, 21 Cal.4th at p. 265.) The court in *Lamden* relied heavily upon its prior decision in *Nahrstedt*, which addressed the standards to be applied in enforcing recorded use restrictions that satisfy the requirements of equitable servitudes. In *Nahrstedt*, the court declared that an association must make findings of use restriction violations in "good faith, not in an arbitrary or capricious manner." (*Nahrstedt, supra*, 8 Cal.4th at p. 383.) It held: "Generally, courts will uphold decisions made by the governing board of an owner's association so long as they represent good faith efforts to further the purposes of the common interest development, are consistent with the development's governing documents, and comply with public policy." (*Id.* at p. 374; see also *Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642, 650 [191 Cal.Rptr. 209] ["It is a settled rule of law that homeowners' associations must exercise their authority to approve or disapprove an individual homeowner's construction or improvement plans in conformity with the declaration of covenants and restrictions, and in good faith."].)

■ Applying those standards here, it is clear that while the Covenant's grant of discretionary decisionmaking authority to the Board and Art Jury is broad, it is not unbridled. *Lamden*'s rule of conditional judicial deference places limits upon how the Art Jury and Board may exercise their discretion in approving or rejecting improvement plans based on their subjective aesthetic judgment. Under those standards, where the record indicates the Art Jury and Board acted within the authority granted to it by the Covenant, pursuant to a reasonable investigation, in the best interests of the community and not in an arbitrary manner, we will respect and uphold their decisions. Having sought a declaration that the Art Jury and Board imposed restrictions unreasonably and arbitrarily, it was Dolan-King's burden at trial to make that showing before the trial court. (*Merkley v. Merkley* (1939) 12 Cal.2d 543, 547 [86 P.2d 89] [the plaintiff in a declaratory relief action has the burden to show the conditions exist that will justify the court in exercising its discretion to grant the relief sought].)

## A. *The Room Addition Proposal*

Exercising its right to ensure a "uniform and reasonably high standard of artistic result and attractiveness" under paragraph 46 of the Covenant, the

Art Jury denied Dolan-King's turret-style room addition proposals on the ground they were designed with an overabundance of glass (door and window). At trial, an Art Jury member testified the Art Jury had visited Dolan-King's property, viewed the rear of her house, and compared the glass-to-stucco ratio of the rest of the house with that of the proposed additions. Initially, the Art Jury expressed dislike for the form (the turret shape) of the additions in relation to the rest of the house, but after considering Dolan-King's architect's presentation of Spanish Colonial Revival period architecture it eventually conceded the round turrets would be acceptable if the window-to-stucco mass were changed. The Art Jury's ultimate decision was made after it reviewed her architect's exhibits, discussed the proportion of stucco to window, the general architectural styles and compared the general Santa Barbara architectural style to Dolan-King's plans. It is clear that in the Art Jury's opinion, the proposed addition designs did not meet its aesthetic standards because the fenestration did not "harmonize" with the remainder of the residence, nor was it consistent with the style of architecture promoted by Dolan-King's architect. The Art Jury communicated to Dolan-King their view that her additions would be acceptable if the designs were altered to decrease the window and door mass.

The Art Jury's decision to reject Dolan-King's room addition proposal was well within the scope of its authority under the Covenant, and, based upon its investigation and stated reasoning, was a reasonable and good faith effort to maintain architectural consistency with the remainder of her home as well as the neighborhood. Dolan-King did not meet her burden to show otherwise. While Dolan-King pointed out several commercial buildings and homes with turret-shaped rooms in Rancho Santa Fe,[7] in our view they do not reflect the kind of inconsistency between the addition and the original structure as the Art Jury noted with regard to Dolan-King's proposals.

The Board's action upholding the Art Jury's decision was also well within its discretion and authority. The Board is empowered to rely upon the Art Jury's recommendation, which was based upon the Art Jury's visits to the Dolan-King residence and discussions with her architect. Although Dolan-King faults the Board for failing to view her residence or otherwise "investigate" the matter, nothing in the Covenant requires the Board to conduct its own independent investigation.[8] We conclude the Board's decision rejecting Dolan-King's proposed additions was entitled to deference and the court,

---

[7]The court made no fact findings with regard to these buildings, to which we would defer.

[8]Section III of the Covenant address procedures and standards for appeals of the Art Jury's decisions to the Association's Board. It provides that at the appeal hearing, "the appellant and his witnesses shall be fully heard, the decision or ruling of the Art Jury appealed from shall be read and the members of the Art Jury and their officers shall be heard as to the reasons for

relying upon an overly restrictive interpretation of the Covenant, abused its discretion in declaring it in excess of the Board's authority and not rationally related to the Association's purposes.

### B. *The Fence Proposal*

■ The court reached the following conclusions regarding Dolan-King's fence application: It found the parties did not dispute Dolan-King's home was of "Spanish Colonial Revival," which was an acceptable type of type I architecture under the Covenant. It noted the Covenant was silent on the type of perimeter fence appropriate for the type I architectural district, but drew an inference that the Covenant required such a fence be consistent with the Santa Barbara/Monterey/Spanish Colonial Revival type of architecture. The court ruled that, from an aesthetic standpoint, the fence should be compatible with the architectural style of Dolan-King's home and other existing fences. Moreover, the court ruled there were inconsistencies between the Covenant's requirements and the Guidelines, but noted the parties agreed the Guidelines were not restrictive covenants and concluded the Covenant's provisions controlled. It acknowledged Dolan-King's architect's testimony that her proposed fence design was beautiful from an artistic standpoint, and "consistent with the Spanish Colonial Revival type architecture required" by the Covenant. The architect testified the pasture-rail type fence, on the other hand, was inconsistent with the Covenant. Based upon these findings and conclusions, the court declared Dolan-King's fence application should have been approved.

The court's ruling was based upon an overly narrow interpretation of both the Covenant's grant of authority to the Art Jury and Board and its scope of permissible architectural types for improvements in Rancho Santa Fe. As we have explained, the Art Jury and Board acted well within their power to render subjective, aesthetic judgments about Dolan-King's fence design. The Art Jury had the discretion to base its decision on a finding that a particular improvement lacked "harmony" with the subject property and its surrounding neighborhood. The court found the Guidelines inconsistent with the Covenant's provisions relating to architectural type, specifically, the court

---

making the decision or ruling appealed from. . . . After full hearing as aforesaid and due consideration the Board . . . shall have the power by affirmative vote of at least four-fifths of the entire membership of the said directors to modify said act, decision and/or ruling of the Art Jury; provided that said modification shall only be ordered in a case where the directors find that such decision or ruling of the Art Jury works an undue hardship upon said petitioner or that a modification of the decision or ruling of the Art Jury will not tend unduly to lower the standards of attractiveness of the surrounding property or depreciate the neighborhood, or that there was bias or prejudice on the part of one or more members of the Art Jury as to said decision or ruling."

decided the Guidelines' stated preference for corral- or pasture-rail-type fences was contrary to the Spanish Colonial Revival type of architecture mentioned in the Covenant. We do not interpret the Covenant or the Guidelines so literally or restrictively. The Covenant does not mandate the use of structures falling within that particular style of architecture, nor does it purport to define or limit the design of perimeter walls or fences. Indeed, as the Association points out, the Covenant is not at all precise in its description of permissible architectural types. It refers to a distinctive type of architecture that derives its "chief inspiration" "directly or indirectly" from Spanish types found "along the Mediterranean or at points in California, such as Monterey." The Covenant plainly rejects strict adherence to architectural styles. It provides: "The word 'type' is used rather than 'style' because attempts to reproduce 'archeological' or 'period' styles shall be discouraged." The Covenant's designation of architectural types is not only imprecise, but application of the architectural restriction is further "subject to the discretion of the Art Jury."

The relevant inquiry, whether the Art Jury and Board properly exercised their broad discretion, was not directly addressed by the court. The court's findings and conclusions did not establish that either the Art Jury or Board acted arbitrarily, without reasonable investigation or in bad faith in denying Dolan-King's fence application. For example, the court made no finding as to the "rural character" or predominance of fence type within Dolan-King's immediate neighborhood. It did not determine whether other similarly designed homes had pasture-rail fences, or fences with design aspects similar to those proposed by Dolan-King. It did not find that other homes having wrought iron or stucco fences were in neighborhoods with predominantly pasture-rail type fences.

Nor could the court have made these findings on the record before it. At trial, the president of the Board testified that nearly all of the fencing in Dolan-King's neighborhood was pasture-rail-type fencing. A member of the Art Jury explained that one of the bases for the Art Jury's denial of her fence was that its composition, namely the combination of wrought iron and pilasters, was "too urban" and too formal in relation to the character of the neighborhood. She recalled the type of fences in Dolan-King's neighborhood was white pasture-rail, and there were no other fences with pilasters and wrought iron in the neighborhood. Dolan-King's architect conceded there was "quite a bit" of pasture-rail fencing in Rancho Santa Fe, and that style of fencing was consistent with the California ranch style of architecture as well as the Rancho Santa Fe community. While Dolan-King demonstrated homes in Rancho Santa Fe having a mix of fences and walls ranging from solid stucco, wrought iron rail, combined brick and wrought iron, and layered

stone, the mere existence of varying fence styles within Rancho Santa Fe does not establish arbitrary action under the Covenant, which contains no specific design criteria or limitations for perimeter walls and fences. Dolan-King did not demonstrate that those homes with more formal fence styles were surrounded by others having pasture-rail fences or no fences at all.[9] When confronted with videotape of these differing walls, Dolan-King's architect was unable to state where they were located in the community or describe the nature of the property they were located upon. In fact, he pointed out his opinions about the various fences were not given with a view towards the Rancho Santa Fe community as a whole.

We recognize the law requiring evenhanded application of use restrictions creates some tension with the discretionary authority granted to the Art Jury and Board. While aesthetic considerations have their place in the Covenant and there are no absolute standards to guide the Art Jury's judgment and taste, we must point out if the evidence had showed the perimeter fences and walls within Dolan-King's immediate neighborhood (in the Covenant's jurisdiction) lacked consistency, Dolan-King's proposed fence design would not be inappropriate because it would not be out of harmony with them. (See, e.g., *Town & Country Estates Ass'n v. Slater* (1987) 227 Mont. 489 [740 P.2d 668, 669] [design review committee was vested with authority to reject house plans based upon standards of "harmony of external design, location and relation to surrounding structures and topography" which standards were not ambiguous per se, but where the development contained a "cacophony" of house styles, the committee's disapproval of the property owner's plans was unenforceable]; *Ashelford v. Baltrusaitis* (Mo.Ct.App. 1980) 600 S.W.2d 581, 588 [association's rejection of home building plans was unreasonable in light of evidence that other homes in development had exposed foundations and roof pitch similar to the prospective home builders; "[w]hat has been considered reasonable for other lot owners in the subdivision cannot be unreasonable when proposed by defendants"].) On the record before us, however, we cannot find Dolan-King proved she was subjected to the Board's selective and arbitrary exercise of discretion with respect to her fence proposal.

---

[9]Dolan-King did present evidence that in 1996, the Board approved a solid stucco wall for another property owner whose property bordered the edge of Rancho Santa Fe. That owner asked the Art Jury to approve his plans because his property was adjacent to a high traffic road and he and his family desired privacy and relief from traffic light and noise. But there was no evidence as to the character of that owner's surrounding neighborhood or any other evidence that would tend to show arbitrariness, such as similarity between that owner's home design and Dolan-King's. She admits in her brief that the solid stucco wall north and adjacent to her property is not on land located within the Covenant's jurisdiction.

## IV. *Attorney Fee Award*

The Association appealed the court's order granting Dolan-King an award of attorney fees under Civil Code section 1354, subdivision (f).[10] In light of our disposition, we reverse the court's order granting Dolan-King's motion for attorney fees and remand the matter to the superior court to determine entitlement to attorney fees under Civil Code section 1354, subdivision (f). (*Heather Farms Homeowners Assn. v. Robinson* (1994) 21 Cal.App.4th 1568 [26 Cal.Rptr.2d 758].)

## DISPOSITION

The judgment and order awarding attorney fees are reversed and the matter remanded for the superior court to enter judgment for the Association and determine entitlement to attorney fees under Civil Code section 1354, subdivision (f). The Association is to recover its costs on appeal.

Kremer, P. J., and Huffman, J., concurred.

A petition for a rehearing was denied July 20, 2000, and respondent's petition for review by the Supreme Court was denied October 3, 2000. Mosk, J., was of the opinion that the petition should be granted.

---

[10]That section provides: "In any actions specified in subdivision (a) to enforce the governing documents, the prevailing party shall be awarded reasonable attorney's fees and costs. Upon motion by any party for attorney's fees and costs to be awarded to the prevailing party in these actions, the court, in determining the amount of the award, may consider a party's refusal to participate in alternative dispute resolution prior to the filing of the action." (Civ. Code, § 1354, subd. (f).)