Filed 6/12/13  Flowers v. Camico Mut. Ins.

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SYLESTER FLOWERS et al.,<br><br>　　Plaintiffs and Appellants,<br><br>v.<br><br>CAMICO MUTUAL INSURANCE COMPANY,<br><br>　　Defendant and Respondent. | A134890<br><br>(Alameda County<br>Super. Ct. No. RG09-450678) |

In this insurance coverage dispute, plaintiffs Sylester Flowers, Helen Chiongson-Flowers, Alta Tierra Properties, LLC, The Apothecary Eastmont Town Center, Inc., and Ramsell Holding Corporation appeal from the order of the trial court finding that the underlying action at issue here alleged a single claim under the applicable policy, thus triggering the per-claim limit of liability only, and not the aggregate policy limit.  We affirm.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

#### I.  The Parties

The facts are undisputed.[1]  Defendant CAMICO Mutual Insurance Company is an insurance company that issued the professional liability policy at the heart of this case.  All the corporate plaintiffs in this action are entities owned by Sylester Flowers and his wife, Helen Chiongnson-Flowers.  Flowers is the Chairman and CEO of Ramsell Holding

---

[1] The parties agreed to and submitted stipulated facts relative to characterizing and describing the underlying action.

Corporation (Ramsell).  The Apothecary Eastmont Town Center, Inc. (AETC) is a wholly owned subsidiary of Ramsell.  Additionally, at all times relevant to this action, the Flowers owned 99 percent of Alta Tierra Properties, LLC (Alta Tierra).

## II.  *The CAMICO Policy*

Defendant issued Accountants Professional Liability Insurance Policy No. CAL04227 to the Bertorelli Firm (the Firm), which was in effect from January 1, 2005, to January 1, 2006 (the Policy).  The Policy's insuring agreement provides that defendant will pay "those sums that an *Insured* becomes legally obligated to pay as *Damages* because of a *Claim* arising out of an *Insured's* negligent act, error or omission in rendering or failing to render *Professional Services* performed after the *Retroactive Date* and before the end of the *Policy Period*."[2]

The Policy defines a "claim" (which by definition includes a "multiple claim") as follows: "A *Claim* means a demand received by any *Insured* for money or services, and includes the service of suit(s), or a demand for arbitration.  A *Claim* also includes a *Multiple Claim*, which is formed by two or more *Claims* arising out of or resulting from a single act, error or omission in the rendering of *Professional Services*, or from **related or identical acts, errors or omissions** in the rendering of *Professional Services*, whether such demands are made: (1) against one or more *Insureds,* (2) by one or more *Persons,* or (3) during one or more *Policy Periods*."[3]  (Emphasis added.)

The Firm purchased limits of liability of $2 million per claim, with $4 million as the policy aggregate.  The Policy explains the per-claim limit of liability as follows: "The maximum amount payable by the Company for *Damages* and *Claim Expenses* for each covered *Claim* is the Per *Claim* Limit of Liability as stated in the Declarations.  A single Per *Claim* limit of liability applies to a *Multiple Claim*, regardless of the number of claimants, lawsuits, or *Insureds* involved."  The aggregate limit is defined as "[t]he

---

[2] Certain words and phrases are specially defined in the Policy, and are italicized.

[3] The Policy also defines "professional services" as "any professional services performed by an *Insured* as long as the fees or commissions, if any, or other benefits from such services inure to the benefit of the *Named Insured*."  Additionally, a "person" is defined as "any natural person or legal entity."

maximum amount payable by the Company for *Damages* and *Claim Expenses* for all covered *Claims* made and reported during the *Policy Period . . . .*"

### III.  The Underlying Action

Beginning in early 2000, Ranni Hillyer was retained to provide accounting, financial planning, and investment services for plaintiffs.  In 2001, Hillyer introduced Flowers to Rajiv Behti, a member of the Firm.  Thereafter, plaintiffs retained Behti and the Firm to serve as their accountants.

In August 2001, Hillyer commenced her role as chief financial officer (CFO) of Ramsell, AETC, Alta Tierra, and the personal equivalent thereof for Flowers and his wife.  The underlying action asserts that Hillyer used her role as CFO, and her limited authority over Flowers' bank accounts, to embezzle millions of dollars from plaintiffs.  Plaintiffs discovered her embezzlements shortly after her employment terminated in February 2005.

In March 2005, plaintiffs filled a lawsuit against Hillyer, seeking to recover the stolen funds.

On February 5, 2007, plaintiffs filed suit against Behti and the Firm in the underlying action.  Plaintiffs sought to recover damages arising from Hillyer's embezzlements pursuant to legal theories of accounting malpractice, breach of fiduciary duty, breach of contract, and negligent misrepresentation.  The complaint alleged that the Firm negligently, carelessly, and recklessly rendered professional services by repeatedly failing to discover Hillyer's fraudulent scheme of embezzlement, due to Behti's friendship with Hillyer and/or because the Firm benefited financially from her actions.  Plaintiffs claim the Firm's multiple acts, errors and omissions resulted in approximately 72 unauthorized transactions resulting in almost $5 million in combined damages.  Behti and the Firm tendered their defense to defendant.

### IV.  The Action For Declaratory Relief

On March 20, 2009, the parties entered into a settlement agreement and mutual release relating to the February 2007 complaint.  Defendant consented to submit itself to a declaratory relief action, in which the parties agreed to allow the trial court to determine

whether the alleged acts, errors, or omissions giving rise to the underlying lawsuit constituted one claim so as to invoke the per-claim limit of $2 million, or constituted more than one claim so as to implicate the aggregate limit of $4 million.

On May 5, 2009, plaintiffs filed this declaratory relief action.

On February 14, 2012, the trial court issued an order in favor of defendant. The court concluded that the term "related" in the Policy's definition of a "claim," was not an ambiguous term, and meant having a "logical or causal connection." Based upon this definition, the court determined that all the wrongful acts stipulated to by the parties were "related." Specifically, the court concluded that "although the errors and omissions involved several different accountants, several different clients, several different losses, and different engagements or other transactions, they all involved a failure and a breach of duty to detect or guard against embezzlement or other diversions of funds or property by Hillyer, which diversions constitute the sole harm allegedly suffered by the various Plaintiffs."

On March 1, 2012, the trial court entered judgment against plaintiffs. This appeal followed.

## DISCUSSION

### I. Standard of Review

Where the decisive facts underlying a declaratory judgment are undisputed, the reviewing court is confronted with a question of law which is reviewed de novo. (*Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, 974.)

### II. Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co. *(1993) 5 Cal.4th 854* (Bay Cities)

The parties agree the dispositive case here is *Bay Cities*. In *Bay Cities,* a general contractor retained an attorney to represent it in connection with construction work it was performing. (*Bay Cities, supra,* 5 Cal.4th 854, 858.) The contractor had completed work on a project, but was unable to collect a substantial portion of the amount it was owed. The attorney filed a mechanic's lien on behalf of the contractor. (*Ibid.*) However, he did not serve a stop notice on the construction lenders and did not timely seek to foreclose the

4

mechanic's lien, thereby committing two separate acts of negligence. In the ensuing legal malpractice action, the contractor contended it was asserting two separate claims under the attorney's professional liability insurance policy. The trial court agreed, finding that there were two separate acts of legal malpractice and, therefore, the limits of liability under the policy were doubled. (*Ibid.*) The insurance company appealed, contending there was but one claim being asserted. (*Id.* at p. 859.) Our Supreme Court held that the two errors were related and arose out of a specific transaction, the collection of a single debt. Therefore, there was only one claim for purposes of the applicable policy provision, which limited coverage for claims arising out of a series of related acts, errors, or omissions. (*Id.* at p. 873.) In the instant case, the parties agree that *Bay Cities* controls, as it involved the argued relatedness of claims under a "claims made and reported" policy that is similar to the policy at issue here.

## A. *Primary Rights Theory*

A primary right is an individual's right to be free of the particular injury alleged. (*Mycogen Corp. v. Monsanto Corp.* (2002) 28 Cal.4th 888, 904.) Plaintiffs note that in *Bay Cities,* the Supreme Court discussed primary rights because the contractor in that case had sought relief for a single injury under two different legal theories. The court highlighted the fact that, had the plaintiff prevailed in a lawsuit, it would have been limited to recovering only what it lost (payment for its work) due to multiple negligent acts and omissions. (*Bay Cities, supra,* 5 Cal.4th 854, 860.) The court stated, "[the plaintiff] had one primary right—the right to be free of negligence by its attorney in connection with the particular debt collection for which he was retained." (*Ibid.*) The court further explained, "[the plaintiff] had a single right—the right to payment for its construction. The loss of that right as a result of the attorney's two omissions resulted in a single injury." (*Id.* at p. 861.)

Here, plaintiffs focus our attention on four separate instances of malpractice alleged in the underlying action. For purposes of this appeal it is not necessary to describe them in great detail. In brief, plaintiffs allege that (1) accountants at the Firm failed to detect and guard against Hillyer's embezzlements when they audited Ramsell's

5

2002 and 2003 financial statements, (2) Behti failed to protect against Hillyer's embezzlements when he was retained by Flowers to review the procedures governing Hillyer's investment authority, (3) the Firm's accountants failed to discover Hillyer's embezzlements when retained by Alta Tierra to provide accounting and tax services, and (4) the accountants failed to detect Hillyer's embezzlement of Flowers' funds when retained to set up accounting records for a real estate investment. Plaintiffs assert that each individual plaintiff in this case possesses his, her, or its own primary rights to be free of injuries. They also claim that when their primary rights are analyzed, it is evident that different members of the Firm committed separate acts, errors, and omissions that caused different injuries to the different plaintiffs, and were therefore not related.

As defendant correctly observes, the Supreme Court in *Bay Cities* never intended that the primary rights theory be used in such a manner, at least not in the context of the kind of insurance policy that is at issue here. The court's primary rights discussion was in the context of determining whether there was more than one claim at issue, and had no bearing on whether the claims were related: "Under [the policy language], if an attorney's single error harmed two clients and gave each of them a separate claim, those two claims would be treated as a single claim under the policy's limitation of liability. It would be anomalous to limit liability in that circumstance but to disregard the limitation when, as in this case, a single client suffers a single injury as a result of multiple errors." (*Bay Cities, supra,* 5 Cal.4th 854, 861.) The trial court here recognized and correctly found that: "[T]he *Bay Cities* Court did not hold that any time there is more than one 'primary right' involved, this means the alleged errors and omissions cannot be 'related' as used in the applicable policy language. To the contrary, the Court addressed and applied the policy term 'related acts, errors or omissions' as an independent basis of its ruling that the claims against the attorney should be treated as a single 'claim' as defined under the policy." We agree with the trial court's analysis. Plaintiffs' argument thus fails.

**B. The Bay Cities *"Factors"***

Plaintiffs also misread another aspect of *Bay Cities*. The *Bay Cities* court held that the term "related" as it is commonly understood and used "encompasses both logical and

6

causal connections." (*Bay Cities, supra,* 5 Cal.4th 854, 873.)  The court found that, as used in the policy at issue and the circumstances of that case, " 'related' is not ambiguous and is not limited only to causally related acts." (*Ibid.*)  The court also recognized, however, that "At some point, a relationship between two claims, though perhaps 'logical,' might be so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim under the policy." (*Ibid.*)  The court rationalized that the allegations in that case were not attenuated, as "They arose out of the same specific transaction, the collection of a single debt.  They arose as to the same client.  They were committed by the same attorney.  They resulted in the same injury, loss of the debt." (*Ibid.*)  Plaintiffs repeatedly assert in their brief on appeal that, in this passage, the court intended to create a "four-factor test."  They are wrong.  The court was merely emphasizing why, on the facts of that case, the two acts of legal malpractice were "related" within the meaning of the applicable insurance policy.

In the present case, despite the Firm's various engagements for plaintiffs, in every instance, the allegations against the Firm remain the same, that is, the Firm repeatedly failed to detect and guard against Hillyer's embezzlement scheme, which resulted in the same injury to the plaintiffs, namely, the loss of their funds.[4]  We also agree with defendant that even if the underlying action alleges more than one claim, those claims nonetheless form a multiple claim, and trigger only a single per-claim limit of liability under the Policy.  Further, it is critical to note that while there were multiple plaintiffs, as to the Firm there was essentially one client only, namely, the Flowers.  As noted above, all the corporate entity plaintiffs were owned by the Flowers, and the Flowers themselves were the only individual plaintiffs.  We thus agree with the trial court's conclusion that

---

[4] Plaintiffs assert their claims are not "related" because they suffered at least two separate and distinct types of injuries and because each appellant's loss of funds was unique and different. They note that in three instances, the Flowers suffered harm when the titles to three of their properties were clouded.  Our review of the stipulated facts indicates that in each case the clouding of title was precipitated by an act of financial misconduct committed by Hillyer.  Thus, harm caused by the clouding of title was not unduly attenuated from Hillyer's embezzlement activities.  Additionally, plaintiffs do not suggest that the various losses of funds was caused by anything other than Hillyer's undetected misconduct.

the alleged acts, errors, and omissions are "related" within the meaning of the Policy's provisions regarding "claims," including "multiple claims."

## C. Alleged Ambiguity in Policy Language

Finally, plaintiffs complain that the Policy's provision regarding "related" claims is ambiguous and should have been construed against defendant and in favor of coverage. Again, this issue was fully addressed in *Bay Cities*. (*Bay Cities, supra,* 5 Cal.4th 854, 873.) Plaintiffs' attempt to distinguish the instant Policy from the one addressed by the Supreme Court in *Bay Cities* is not persuasive.[5] The court in *Bay Cities* clearly and specifically held that the term "related," as used in a context substantially similar to the present case, was unambiguous. (*Ibid.*)

The *Bay Cities* opinion gives broad reading to the notion of "related." Multiple errors arising from an ongoing relationship between a professional (the insured, the Firm and its accountants) and retained clients (Flowers and his entities) are within the scope of the decision. The separateness of the particular omissions does not change the insurance policy consequences since the retained client was the party who suffered from the several instances of misconduct. The notion of "claim" incorporates malpractice logically as well as causally connected. Multiple instances of misconduct serving the same client, and based on a retained services agreement is enough for one claim under a policy even if arising from advice covering various features of the professional relationship. According to *Bay Cities,* "related" is a "broad word . . . and is not limited only to causally related acts." (*Bay Cities, supra,* 5 Cal.4th 854, 873.)

---

[5] We note plaintiffs place much reliance on Justice Kennard's concurring opinion in *Bay Cities* (*Bay Cities, supra,* 5 Cal.4th 854, 873 (conc. opn. of Kennard, J.)). It is well established that "concurring opinions are not binding precedent . . . ." (*In re Marriage of Dade* (1991) 230 Cal.App.3d 621, 629).

## DISPOSITION

The judgment is affirmed.

_____
Dondero, J.

We concur:

_____
Margulies, Acting P. J.

_____
Banke, J.

9