GILBERT, P. J.
*4 In Lamden v. La Jolla Shores Clubdominium Homeowners Assn. (1999) 21 Cal.4th 249, 87 Cal.Rptr.2d 237, 980 P.2d 940 ( Lamden ), our Supreme Court cautioned courts to give judicial deference to certain discretionary decisions of duly constituted homeowners association boards. The judicial deference rule does not encompass legal questions that may involve the interpretation of the covenants, conditions, and restrictions (CC&Rs) of a homeowners association. Courts decide legal questions.
Here, homeowners cultivated a vineyard for the purpose of making wine to be sold to the public. The CC&Rs did not prohibit *569 the cultivation of a vineyard for this purpose, but they did prohibit "any business or commercial activity." The operation of the vineyard may have constituted "business or commercial activity" in the literal sense of that term. But a literal interpretation in the present case would elevate form over substance and lead to absurd results. (See SDC/Pullman Partners v. Tolo Inc. (1997) 60 Cal.App.4th 37, 46, 70 Cal.Rptr.2d 62 ["literal language of a contract does not control if it leads to absurdity"].) Because the wine was made, bottled, and sold commercially offsite, and the activity at the vineyard did not affect the residential character of the community, we conclude there was no business or commercial activity within the meaning of the CC&Rs. The homeowners association board acted within its discretion in allowing the continued operation of the vineyard, and its decision is entitled to judicial deference.
This appeal is from a judgment and a postjudgment award of attorney fees and costs in favor of Jeffrey Ketelhut and Marcella Ketelhut (the Ketelhuts) and other parties. The Ketelhuts cross-appeal from the award of attorney fees and costs. In the appeal from the judgment, the central issue is whether the Ketelhuts, homeowners in a residential common interest development, violated a restrictive covenant requiring that they not use their property for any business or commercial activity. The Ketelhuts operated a vineyard on their property. After harvesting the grapes, they sent them to a winery to be made into wine. They sold the wine over the Internet.
Other homeowners objected to the operation of what they considered to be a commercial vineyard in violation of the prohibition against any business or commercial activity. The Board of Directors (Board) of the homeowners association - Los Robles Hills Estates Homeowners Association (HOA) - decided that the vineyard was not being used for business or commercial activity.
Plaintiffs/homeowners Felipa Eith and Jeffrey Eith (the Eiths), Thomasine Mitchell and John Mitchell (the Mitchells), Stacy Wasserman, *5 Philip Chang, Morrey Wasserman, and Eileen Gabler (hereafter collectively referred to as "plaintiffs") brought an action against the Ketelhuts, HOA, and Board members Michael Daily, Jeanne Yen, and Frank Niesner (hereafter collectively referred to as "defendants"). The court conducted a lengthy bifurcated trial on the eighth and ninth causes of action. The eighth cause of action concerned whether the operation of the vineyard was a prohibited business or commercial activity. The ninth cause of action sought to quiet title to a common area.
The trial court did not decide whether the operation of the vineyard was a prohibited business or commercial activity. Instead, it invoked the judicial deference rule of Lamden , supra , 21 Cal.4th 249, 87 Cal.Rptr.2d 237, 980 P.2d 940. Pursuant to this rule, the trial court deferred to the Board's decision that the vineyard was not being used for business or commercial activity. The court entered judgment in favor of defendants on both the eighth and ninth causes of action. The resolution of these two causes of action rendered the remaining causes of action moot.
The trial court correctly applied the Lamden judicial deference rule to the Board's decision that the Ketelhuts' operation of the vineyard was not a prohibited business or commercial use. We further conclude that, as a matter of law, it is not a prohibited business or commercial use. In addition, we reject plaintiffs' claim that the judgment is void because the trial judge did not disclose contributions made by defendants' counsel to his campaign for re-election to the superior court. We affirm *570 the judgment as well as the postjudgment award of attorney fees and costs.
Factual Background
In 1966, the Janss Corporation (Janss) developed a 28-lot residential subdivision (Los Robles Hills Estates) in the City of Thousand Oaks. The subdivision is a common interest development subject to the Davis-Sterling Common Interest Development Act. ( Civ. Code, § 4000 et seq. ) "Common interest developments are required to be managed by a homeowners association [citation], defined as 'a nonprofit corporation or unincorporated association created for the purpose of managing a common interest development' [citation], which homeowners are generally mandated to join [citation]." ( Villa De Las Palmas Homeowners Assn. v. Terifaj (2004) 33 Cal.4th 73, 81, 14 Cal.Rptr.3d 67, 90 P.3d 1223.)
Janss created HOA to manage the development. It deeded to HOA an 18.56-acre parcel that the trial court and parties referred to as a "common area." The deed provides, "This conveyance is made on condition that said property shall be used solely for purposes of recreation or decoration or both, and in the event that said property is otherwise used, it shall automatically revert to grantor herein."
*6 The development is subject to a recorded declaration of CC&Rs. Paragraph 1.01 of the CC&Rs provides, "No lot shall be used for any purpose (including any business or commercial activity) other than for the residence of one family and its domestic servants ...." Subparagraph 3 of paragraph 2.03 provides that "[f]or good cause shown ... deviations from the applicable deed restrictions" may be allowed "to avoid unnecessary hardships or expense, but no deviation shall be allowed to authorize a business or commercial use." Paragraph 5.07 provides, "Every person acquiring a lot ... covenants to observe, perform and be bound by this Declaration of Restrictions."
In June 2003, the Ketelhuts purchased in the development a 1.75-acre lot on Pinecrest Drive (the Property). In 2005, they planted a vineyard consisting of 600 plants. The plants extended "just under .4 acres" into the 18.56-acre common area. In their brief, defendants acknowledge, "Unbeknownst to the Ketelhuts and [HOA], some of the grape plants encroached on the [common area]." In 2011, when HOA learned of the encroachment, its counsel wrote a letter to the Ketelhuts' counsel "demanding that [the Ketelhuts] immediately remove the vines from the common area, as well as any other items that may be located upon the Association's common area."
Before planting the grape vines, the Ketelhuts submitted a landscape plan (Exhibit 244) to the Board. It was approved by the Board's Architectural Committee (the Committee). The plan divided the Property into three separate vineyards. One would grow grapes for Cabernet Sauvignon, the second for Sangiovese, and the third for Merlot. The plan did not indicate the number of grape vines that would be planted. The Ketelhuts did not inform the Board or the Committee that the grapes grown on the Property would be used to make wine that would be offered for sale to the public.
Pranas Raulinaitis, who served on the Committee in 2005, testified that the Committee members "viewed the [vineyard] as an amazing [aesthetic] enhancement to the neighborhood." It "never entered into [his] mind" that "the vineyard was being planted for commercial sale of wine to the public."
The first harvest was in 2008. At that time, Jeffrey Ketelhut "harvested the grapes ... with the intention of bottling *571 them for sale." He "commenc[ed the] wine business in 2009." Jeffrey Ketelhut admitted that "the sale[ ] of wine is a business" and that the vineyard "operates like a business." But he characterized the vineyard "as a hobby where I do it in my spare time." "[M]y purpose in getting involved wasn't to generate a profit and this become a livelihood. This was a hobby. I enjoy gardening .... [T]hat was therapy for me." The Ketelhuts never determined whether, excluding attorney fees, the vineyard generated a profit. Including attorney fees, it has not generated a profit in any year. *7 Although the Ketelhuts' tax returns were not produced, Jeffrey Ketelhut testified that he had filed Internal Revenue Service Schedule C (Form 1040) for the vineyard. Pursuant to Evidence Code sections 459 and 452, subdivision (h), we take judicial notice that Schedule C is entitled "Profit or Loss from Business (Sole Proprietor)." We also take judicial notice that, since 2009, page 1 of the instructions for Schedule C has provided, "Use [Schedule C (Form 1040) ] to report income or loss from a business you operated or a profession you practiced as a sole proprietor. An activity qualifies as a business if: your primary purpose for engaging in the activity is for income or profit, and you are involved in the activity with continuity and regularity. For example, a sporadic activity or a hobby does not qualify as a business ." (Italics added.)
In 2009, the Ketelhuts filed in Ventura County a fictitious business name statement showing that they were doing business at the Property as "Los Robles Hills Winery" and "Puerta del Cielo Vineyards." They applied and obtained a "Type 17 and Type 20 license [from the Department of Alcoholic Beverage Control], which [permits] retail and wholesale [sales] over the internet only." They also obtained "a Thousand Oaks business license." The licenses showed that the business was located at the Property. But in 2012, the location of the business was changed to a Camarillo address.
The Ketelhuts began selling wine in May 2010. With one exception, they have sold only wine made from grapes grown on the Property. The exception occurred in 2011, when they made wine from sauvignon blanc grapes that they had purchased. In 2015, the Ketelhuts harvested 2,000 pounds of grapes. They invited family, friends, and neighbors to participate in the harvesting. Jeffrey Ketelhut testified, "[I]t took us an hour-and-a-half to pull down all the grapes."
After the grapes are harvested, they are transported to "Camarillo Custom Crush [in Camarillo], where all the winemaking takes place." Camarillo Custom Crush puts the wine into bottles that bear the Ketelhuts' personal label. The Ketelhuts do not store wine on the Property. They have a storage facility in Malibu. They do not ship bottles of wine from the Property.
"In a typical year," the Ketelhuts are "fortunate" to produce two barrels of wine. "[A] single barrel can hold up to 30 cases." Each case contains 12 bottles. Thus, the maximum typical annual production is 720 bottles of wine. But in 2009, the Ketelhuts "produced 132 cases," which is 1,584 bottles of wine.
At the time of trial in November 2015, the wine production was "dwindling" because they had "los[t] vines [due] to drought." The original 600 *8 plants had been reduced to about 400. Jeffrey Ketelhut estimated that production for 2014 and 2015 would be 50 cases per year. The wine for these years was still being stored in barrels.
The Ketelhuts retain ownership of the bottled wine. They advertise on Facebook, *572 Twitter, their personal web site, "and through [their] wholesale accounts." The logo "Los Robles Hills Winery" and their website address are displayed on the exterior of their truck, which they park in the driveway of the Property. "[T]hey keep the truck covered" while it is on the Property.
The Ketelhuts "sold wine to a number of restaurants and hotels in the local area." But because of plaintiffs' lawsuit, they "let those [local sales] lapse." At the time of trial, they were "still offer[ing] retail sales and wholesale sales," but were probably giving "at least 60 percent" of their wine to "charity." For the last two years, their retail sales have been "zero." Their wines appear on the menu at "a few" restaurants.
Exhibit No. 35 contains copies of pages from the Ketelhuts' web site. The pages are dated May 22, 2014. The wines for sale range in price from $27 to $42 per bottle.
In January 2011, the Ventura County Star published an article about the Ketelhuts' "winery." The article said that they "were hosting wine tastings by appointment at [their] home tasting room." In March 2011, the Department of Alcoholic Beverage Control informed the Ketelhuts that someone had complained about the wine tastings. The Ketelhuts denied hosting wine tastings on the Property.
In its statement of decision, the trial court found: "There was ... no retail traffic to the premises or tasting room on the premises at [the Property]. What was accomplished [there] was cultivation of the grapes, picking of the grapes, and transportation of the grapes to Camarillo."
Some homeowners complained about the vineyard. In August 2011 counsel for plaintiffs Felipa Eith and Stacy Wasserman wrote a letter to the Ketelhuts "indicating that the commercial vineyard was a violation of the CC&Rs and that [they] should stop that aspect of [their] business." The letter did not demand that the Ketelhuts stop growing grapes on the Property. It demanded that they "[c]ease operating a commercial vineyard." The letter also demanded that the Ketelhuts "[r]emove all encroaching plants, irrigation and any other vineyard materials ... from the ... common area."
The Board, which consisted of five homeowners, investigated the Ketelhuts' operation of the vineyard. It interviewed other homeowners. In *9 June 2011, it conducted a meeting that was open to all of the homeowners. The Ketelhuts appeared and answered questions. After the meeting, three of the five board members - defendants Daily, Yen, and Niesner - concluded that the Ketelhuts were not using the Property for a nonresidential purpose in violation of paragraph 1.01 of the CC&Rs. They found that there was no prohibited business or commercial activity on the Property.
Board member Daily considered the vineyard to be "landscaping" rather than a business. He explained: "They were growing grape vines just like I grow fruit trees and Mr. Krupnick [a homeowner] grows avocado trees, and people grow grass in their yard. It was landscape." "[T]herefore I wasn't going to, as a board member, try to restrict them from growing grapes. Like I wouldn't restrict anybody else from growing fruit or whatever." "Their growing grapes was part of their landscape plan."
On the other hand, Daily understood that "the growing phase of their winery was part of the business." "You have to have grapes in order to make wine." Daily continued: "I believe that aspect to their business [growing grapes] is acceptable because it's their landscape." "The growing of grapes is certainly not something prohibited by the CC&R'S and if somebody *573 takes those grapes in a very limited way without impact on the community, then I don't really care what they do with them. They can make jelly and sell it. That's fine with me." "I considered that [the Ketelhuts] were going to do something that was not going to have a negative impact on the community and therefore it was allowable."
Daily did not "know how to define the difference between business and commercial" activity. He said: "[W]hen I think of commercial activity, I think of something, you know, in a building, you know, off site. That's what I think of as commercial activity."
Board member Yen testified that "commercial activity" within the meaning of the CC&Rs "is something that would cause a stress in the community, whether it be traffic, whether it be individuals, that it's something that disrupts our quality in our community and impacts your neighbors. That's commercial activity." Yen did "not see picking grapes to go to Custom Crush [a]s impairing any activities in the community or in any way creating blockage to the community or a problem for the community."
Procedural Background
Plaintiffs filed a complaint consisting of nine causes of action. The trial court bifurcated the eighth and ninth causes of action and tried them first. The trial began in July 2015 and ended in November 2015.
*10 The eighth cause of action is against HOA and the Ketelhuts. It seeks declaratory and injunctive relief. It requests "a judicial determination and decree that the CC&Rs and Grant Deed prohibit" the Ketelhuts from (1) operating their "Business" and "commercial enterprise," including the vineyard, on the Property and the common area, and (2) encroaching on the common area. The eighth cause of action also requests the issuance of a permanent injunction prohibiting the Ketelhuts from operating their business on the Property and encroaching on the common area.
The ninth cause of action is against all defendants. It seeks to quiet title to the common area. It claims that each of the 28 lot owners has an undivided 1/28th ownership interest in the common area and is "entitled to the non-exclusive possession" of that area. The ninth cause of action sought a judicial declaration that HOA has "no estate, right, title or interest" in the common area.
The remaining seven causes of action are for nuisance; trespass; breach of the CC&Rs; breach of HOA's fiduciary duty; breach of fiduciary duty by Board members; and "willful, wanton misfeasance and gross negligence." In its statement of decision, the trial court said it had ordered that "[t]he remaining causes of action, for which a jury had been demanded, would be set for trial as may be necessary following determination of the Declaratory Relief and Quiet Title causes of actions."
Prior to trial on the eighth and ninth causes of action, all plaintiffs except Felipa Eith dismissed the entire action against HOA and Board members.
Statement of Decision
On the eighth cause of action for declaratory and injunctive relief, in its statement of decision, the trial court said that it was "faced with ... whether or not to exercise its independent analysis of whether or not what the Ketelhuts were doing is a business or commercial activity, or to determine if the HOA had the discretionary authority to allow the Ketelhuts to do what they did under what is commonly known as the business judgment rule." The court applied the "deferential business judgment standard adopted by [
*574 Lamden , supra , 21 Cal.4th 249, 87 Cal.Rptr.2d 237, 980 P.2d 940 ]."
The trial court ruled: "The Court finds here that the defendant HOA and its individual directors acted in good faith in addressing the activities of the defendants Ketelhut, and that this decision should not be re-examined within the context of this litigation. ... As noted in Beehan v. Lido Isle (1977) 70 Cal.App.3d 858 @ 865 [137 Cal.Rptr. 528], 'The board of directors may make incorrect decisions, as well as correct ones, so long as it *11 is faithful to the corporation and uses its best judgment.' ... The Court finds that this board of directors used it[s] best judgment and acted in a reasonable manner under the circumstances presented to it. As such, the Court does not grant the relief that plaintiffs seek, but finds in favor of the defendants on the cause of action for declaratory relief." (Italics added.)
On the ninth cause of action to quiet title to the common area, the trial court found that the area was deeded to HOA in 1966. "[N]o fractional interest in the property was deeded to any homeowners. Since that time, there have been no other documents, recorded or otherwise, that purport[ ] to grant to the homeowners the 1/28 fractional interest that they are seeking in this action." Therefore, "title to the 18.5 acre common area is confirmed and quieted to [HOA]."
Judgment
On the eighth and ninth causes of action, the trial court entered judgment in favor of defendants. The judgment does not mention the remaining seven causes of action. In its statement of decision, the trial court said, "The rulings here made moot plaintiffs['] remaining causes of action. The case is therefore not set for further trial on those issues."
Thus, the judgment disposed of all nine causes of action and is appealable under the one final judgment rule of Code of Civil Procedure section 904.1, subdivision (a). "Judgments that leave nothing to be decided between one or more parties and their adversaries ... have the finality required by section 904.1, subdivision (a). A judgment that disposes of fewer than all of the causes of action framed by the pleadings, however, is necessarily 'interlocutory' ( Code Civ. Proc., § 904.1, subd. (a) ), and not yet final, as to any parties between whom another cause of action remains pending." ( Morehart v. County of Santa Barbara (1994) 7 Cal.4th 725, 741, 29 Cal.Rptr.2d 804, 872 P.2d 143.)
PLAINTIFFS' APPEAL
The Judgment Is Not Void Because of the Trial Judge's Alleged Disqualification
A. Factual and Procedural Background
The complaint was filed on August 31, 2011. The case was assigned to Judge Henry J. Walsh.
*12 After a contested judicial election, Judge Walsh was reelected in 2012. On February 10, 2016, the Commission on Judicial Performance admonished Judge Walsh for failing to disclose contributions made to his 2012 campaign by attorneys who had appeared before him after the election. The Commission noted, "In 2010, effective January 1, 2011, subdivision (a)(9)(C) was added to Code of Civil Procedure section 170.1 to require judges to disclose campaign contributions of $100 or more."
On the same day that Judge Walsh was admonished, he signed the judgment in the instant case.[1] The next day, plaintiff *575 Felipa Eith filed a request for a stay of all further action by Judge Walsh pending a hearing on a not yet filed motion to disqualify him.
On March 2, 2016, Felipa Eith filed a motion to disqualify Judge Walsh for cause pursuant to Code of Civil Procedure section 170.1. The ground for the motion was that he had received campaign contributions from defendants' counsel and had not disclosed them to plaintiffs. Eith alleged, "Recent inspection of recorded and filed election documents (Form 460) establishes that during the pendency of the instant action Judge Walsh solicited, accepted and kept secret from Plaintiffs and plaintiffs' counsel, monetary contributions to his campaign from defense counsel [firm, partners, or staff attorneys] in the amount of $2,600.00 ...." (Brackets in original.) A minute order entered nine days later on March 11, 2016, states: "Without conceding the merit of allegations of prejudice made by Ms. Eith, the court recuses itself from the case, and refers it to the supervising civil judge for re-assignment."
Plaintiffs filed a motion for a new trial. They argued that Judge Walsh's failure to disclose the campaign contributions denied them their right to a fair trial. Plaintiffs claimed that, if Judge Walsh had made a timely disclosure, they "would certainly have sought his disqualification in 2012 to preclude the possibility that he would preside at trial."
Judge John Nho Trong Nguyen denied the motion for a new trial. He ruled, "When the facts are viewed as a whole they show that no person aware of them might reasonably entertain a doubt that Judge Walsh would be able to be impartial."
*13 B. Analysis
Plaintiffs argue that the judgment is void because Judge Walsh was disqualified years before the trial when he failed to disclose contributions made by defendants' counsel. If Judge Walsh were so disqualified, the judgment would be void. In Christie v. City of El Centro (2006) 135 Cal.App.4th 767, 776, 37 Cal.Rptr.3d 718, the court "conclude[d] that because [the trial judge] was disqualified at the time he granted the City's motion for nonsuit, that ruling was null and void and must be vacated regardless of a showing of prejudice." The court rejected the City's claim "that the grant of nonsuit need not be overturned because [the judge] was not disqualified until later" when a motion to disqualify him was granted: "[D]isqualification occurs when the facts creating disqualification arise, not when disqualification is established. [Citations.] The acts of a judge subject to disqualification are void or, according to some authorities, voidable. [Citations.] Relief is available to a party who, with due diligence, discovers the grounds for disqualification only after judgment is entered or appeal filed. [Citations.] Although a party has an obligation to act diligently, he or she is not required to launch a search to discover information that a judicial officer should have disclosed. [Citations.]" ( Id . at pp. 776-777, 37 Cal.Rptr.3d 718.)
The relevant statute is Code of Civil Procedure section 170.1, subdivision (a)(9), *576 which provides: "A judge shall be disqualified" if: "(A) The judge has received a contribution in excess of one thousand five hundred dollars ($1500) from a party or lawyer in the proceeding , and either of the following applies: [¶] (i) The contribution was received in support of the judge's last election, if the last election was within the last six years. [¶] (ii) The contribution was received in anticipation of an upcoming election. [¶] (B) Notwithstanding subparagraph (A), the judge shall be disqualified based on a contribution of a lesser amount if subparagraph (A) of paragraph (6) applies." (Italics added.) Subparagraph (A) of paragraph (6) provides that a judge shall be disqualified if "[f]or any reason: [¶] (i) The judge believes his or her recusal would further the interests of justice. [¶] (ii) The judge believes there is a substantial doubt as to his or her capacity to be impartial. [¶] (iii) A person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." (Italics added.)
The California Supreme Court Committee on Judicial Ethics Opinions (CJEO) issued an opinion on mandatory disqualification based on a contribution of more than $1,500: CJEO Formal Opinion 2013-003 (http://www.judicialethicsopinions.ca.gov/wp-content/uploads/cjeo_formal_opinion_2013-003.pdf). CJEO concluded, and we agree, that the $1,500 disqualification threshold "applies to the individual lawyer appearing in the matter." (Id . at p. 11.) "[T]he Legislature did not intend the $1,500 threshold for disqualification to apply to aggregated contributions from multiple individuals from the *14 same law firm, nor to all individuals practicing law in a contributing law firm. A judge receiving such contributions however, is also required to make a determination as to whether disqualification is called for under section 170.1, subdivision (a)(6) [A](iii) and [ (a) ](9)(B)." (Ibid .) "[M]andatory disqualification for individual attorney contributions over the $1,500 threshold, together with discretionary disqualification for aggregated and law firm contributions, sufficiently ensures the public trust in an impartial and honorable judiciary." (Ibid .)
In their opening briefs, plaintiffs list the contributions of all of the lawyers who allegedly represented defendants during the five years of litigation. No lawyer contributed more than $1,500 to Judge Walsh's campaign. Thus, the mandatory disqualification provision is inapplicable. ( Code Civ. Proc., § 170.1, subd. (a)(9)(A).)
Plaintiffs have failed to show that Judge Walsh was disqualified because "[a] person aware of the facts might reasonably entertain a doubt that [he] would be able to be impartial." ( Code Civ. Proc., § 170.1, subd. (a)(6)(A)(iii).) Thus, we reject plaintiffs' claim that Judge Nguyen abused his discretion in denying their motion for a new trial. (See Garcia v. Rehrig International, Inc. (2002) 99 Cal.App.4th 869, 874, 121 Cal.Rptr.2d 723 [" ' " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears' " ' "]; Boyle v. CertainTeed Corp. (2006) 137 Cal.App.4th 645, 649-650, 40 Cal.Rptr.3d 501 ["an appealed judgment is presumed correct, and plaintiff bears the burden of overcoming the presumption of correctness"].)
[ [/] ]**
The Trial Court Properly Applied the Judicial Deference Rule Adopted by Our Supreme Court in Lamden
In its statement of decision, the trial court applied the rule of judicial deference *577 adopted by our Supreme Court in Lamden , supra , 21 Cal.4th 249, 87 Cal.Rptr.2d 237, 980 P.2d 940. The plaintiff homeowner in Lamden complained that a condominium development's community association had wrongly decided to treat a termite infestation "locally ('spot treat')." ( Id . at p. 252, 87 Cal.Rptr.2d 237, 980 P.2d 940.) The plaintiff wanted the association to fumigate the building. The Supreme Court stated, "[W]e adopt *15 today for California courts a rule of judicial deference to community association board decisionmaking that applies ... when owners in common interest developments seek to litigate ordinary maintenance decisions entrusted to the discretion of their associations' boards of directors. [Citation.]" ( Id . at p. 253, 87 Cal.Rptr.2d 237, 980 P.2d 940.) The rule is as follows: "Where a duly constituted community association board, upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members, exercises discretion within the scope of its authority under relevant statutes, covenants and restrictions to select among means for discharging an obligation to maintain and repair a development's common areas, courts should defer to the board's authority and presumed expertise." ( Ibid . )
The Supreme Court explained: "The formulation we have articulated affords homeowners, community associations, courts and advocates a clear standard for judicial review of discretionary economic decisions by community association boards, mandating a degree of deference to the latter's business judgments sufficient to discourage meritless litigation .... [¶] Common sense suggests that judicial deference in such cases as this is appropriate, in view of the relative competence, over that of courts, possessed by owners and directors of common interest developments to make the detailed and peculiar economic decisions necessary in the maintenance of those developments. A deferential standard will, by minimizing the likelihood of unproductive litigation over their governing associations' discretionary economic decisions, foster stability, certainty and predictability in the governance and management of common interest developments." ( Lamden , supra , 21 Cal.4th at pp. 270-271, 87 Cal.Rptr.2d 237, 980 P.2d 940.)
Some courts have narrowly construed the Lamden rule. In Affan v. Portofino Cove Homeowners Assn. (2010) 189 Cal.App.4th 930, 940, 117 Cal.Rptr.3d 481, the court observed: "It is important to note the narrow scope of the Lamden rule. It is a rule of deference to the reasoned decisionmaking of homeowners association boards concerning ordinary maintenance. ... The Supreme Court's precise articulation of the rule makes clear that the rule of deference applies only when a homeowner sues an association over a maintenance decision that meets the enumerated criteria. [Citations.]" (See also Ritter & Ritter, Inc. v. The Churchill Condominium Assn. (2008) 166 Cal.App.4th 103, 122, 82 Cal.Rptr.3d 389.)
Most courts have broadly construed the Lamden rule. In Haley v. Casa Del Rey Homeowners Assn. (2007) 153 Cal.App.4th 863, 875, 63 Cal.Rptr.3d 514 ( Haley ), the court concluded that Lamden "reasonably stands for the proposition that the Association had discretion to select among means for remedying violations of the CC&R's without resorting to expensive and time-consuming litigation, and the courts should defer to that discretion."
*16 In Harvey v. The Landing Homeowners Assn. (2008) 162 Cal.App.4th 809, 820, 76 Cal.Rptr.3d 41 ( Harvey ), the CC&Rs allowed the board "to designate storage areas in the common area." They also gave the board "the exclusive right to manage, *578 operate and control the common areas." ( Ibid . ) The court held, "Under the 'rule of judicial deference' adopted by the court in Lamden , we defer to the Board's authority and presumed expertise regarding its sole and exclusive right to maintain, control and manage the common areas when it granted the fourth floor homeowners the right, under certain conditions, to use up to 120 square feet of inaccessible attic space common area for rough storage." ( Id . at p. 821, 76 Cal.Rptr.3d 41.)
In Watts v. Oak Shores Community Association (2015) 235 Cal.App.4th 466, 473, 185 Cal.Rptr.3d 376 ( Watts ), this court rejected the plaintiffs' claim "that the rule applying judicial deference to association decisions applies only to ordinary maintenance decisions." We reasoned: "It is true the facts in Lamden involve the association board's decision to treat termites locally rather than fumigate. But nothing in Lamden limits judicial deference to maintenance decisions." ( Ibid . ) "[T]here is no reason to read Lamden so narrowly." ( Ibid . ) "Common interest developments are best operated by the board of directors, not the courts." ( Ibid . ) We applied the judicial deference rule to the board's adoption of rules and imposition of fees relating to short-term rentals of condominium units. We noted that, in Dolan-King v. Rancho Santa Fe Assn. (2000) 81 Cal.App.4th 965, 979, 97 Cal.Rptr.2d 280 ( Dolan-King ), "the court gave deference to an association board's decision denying an owner's application for a room addition on aesthetic grounds." ( Watts , supra , 235 Cal.App.4th at p. 473, 185 Cal.Rptr.3d 376.)
Based on Lamden , Haley , Harvey , Watts , and Dolan-King , the judicial deference rule applies to an association board's discretionary decisions concerning the operation of the common interest development, e.g., the board's maintenance and repair decisions ( Lamden ), its selection of the appropriate means to remedy a violation of the CC&Rs ( Haley ), its designation of storage space in a common area ( Harvey ), its adoption of rules relating to short-term rentals ( Watts ), or its approval or rejection of a homeowner's improvement plan ( Dolan-King ). As we observed in Watts , "Common interest developments are best operated by the board of directors, not the courts." ( Watts , supra , 235 Cal.App.4th at p. 473, 185 Cal.Rptr.3d 376.)
Here, the Board made a decision concerning the operation of the common interest development. The Board decided whether the Ketelhuts violated the CC&Rs' prohibition against the use of the Property for business or commercial activity. The Board reasoned that the CC&Rs' prohibition did not encompass the operation of the vineyard because it did not affect the residential character of the community. Board member Daily testified, "I
*17 considered that [the Ketelhuts] were going to do something that was not going to have a negative impact on the community and therefore it was allowable." Board member Yen did "not see picking grapes to go to Custom Crush [a]s impairing any activities in the community or in any way creating blockage to the community or a problem for the community."
We do not defer to the Board's interpretation of the CC&Rs. The interpretation of CC&R's is a legal question to be decided by the courts, not the Board. "CC&R's are interpreted according to the usual rules for the interpretation of contracts generally, with a view toward enforcing the reasonable intent of the parties. [Citations.]" ( Harvey , supra , 162 Cal.App.4th at p. 817, 76 Cal.Rptr.3d 41.) " ' "[N]ormally the meaning of contract language ... is a legal question." [Citation.] "Where, as here, no conflicting parol evidence is introduced concerning the interpretation *579 of the document, 'construction of the instrument is a question of law, and the appellate court will independently construe the writing.' " [Citation.]' " ( Cohen v. Five Brooks Stable (2008) 159 Cal.App.4th 1476, 1483, 72 Cal.Rptr.3d 471 ; see also Legendary Investors Group No. 1, LLC v. Niemann (2014) 224 Cal.App.4th 1407, 1413, 169 Cal.Rptr.3d 787 ["contract interpretation is a legal question for the court"].)
In our review of the CC&Rs, we conclude that the Board correctly interpreted the prohibition of business or commercial activity. The prohibition does not encompass activity that has no effect on the community's residential character. The purpose of the prohibition is to preserve the community's residential character.
The trial court properly deferred to the Board's discretionary decision that the Ketelhuts' operation of the vineyard did not violate the prohibition against business or commercial activity because it did not affect the community's residential character. The Board made its decision "upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members." ( Lamden , supra , 21 Cal.4th at p. 253, 87 Cal.Rptr.2d 237, 980 P.2d 940.). The Board interviewed homeowners and conducted a public hearing at which the Ketelhuts answered questions. Yen testified that the Board's decision was "based on our looking at it from the scope of the community: Is it creating any stress for the community, is it impairing the community's functioning, is it invasive to the community, and have we received any complaints regarding what is happening." "Our decision and focus of discussion was on the impact o[n] the community."
"Common sense suggests that judicial deference in such cases as this is appropriate, in view of the relative competence, over that of courts, possessed by owners and directors of common interest developments ...." ( Lamden , supra , 21 Cal.4th at p. 270, 87 Cal.Rptr.2d 237, 980 P.2d 940.) The Board members lived in the community and had discussed the Ketelhuts' vineyard with other homeowners. They *18 were in a much better position than the courts to evaluate the vineyard's effect on the community. We "should defer to the [B]oard's authority and presumed expertise." ( Id . at p. 265, 87 Cal.Rptr.2d 237, 980 P.2d 940.)
The Board Correctly Decided that the Operation of the Vineyard Is Not Prohibited Business or Commercial Activity
As an alternative holding, we conclude that as a matter of law, the Ketelhuts' operation of the vineyard is not prohibited business or commercial activity because it does not affect the community's residential character.
No signs advertising wine sales are posted on the Property. Although the Ketelhuts' logo "Los Robles Hills Winery" and their website address are displayed on the exterior of their truck, "they keep the truck covered" while it is on the Property. The wine is made and bottled in Camarillo. The bottled wine is stored in Malibu. It is not shipped from the Property. The trial court found that there is "no retail traffic" to the Property, which does not have a wine-tasting room. The court said, "What was accomplished [on the Property] was cultivation of the grapes, picking of the grapes, and transportation of the grapes to Camarillo."
Had the Ketelhuts retained the wine for their personal use or given it away to friends or charity, there would have been no basis for finding business or commercial activity. All activities relating to the vineyard would have been permissible. That the Ketelhuts offered the wine for sale *580 over the Internet did not transform their use of the Property into prohibited business or commercial activity. At all times the operation of the vineyard was fully consistent with residential use. No homeowner familiar with the vineyard's operation would have had reason to suspect that the vineyard was being used to produce wine for sale to the public. The business or commercial activity of making and selling the wine did not occur on the Property. Board member Daily testified, "They were growing grape vines just like I grow fruit trees and Mr. Krupnick grows avocado trees, and people grow grass in their yard." Moreover, instead of being a blight on the community, the vineyard was an aesthetic enhancement. Pranas Raulinaitis, who served on the Committee that approved the Ketelhut's landscape plan in 2005, testified that the Committee members "viewed the [vineyard] as an amazing [aesthetic] enhancement to the neighborhood."
We recognize that the growing of grapes on the Property is an integral part of the Ketelhuts' winemaking business. As Daily testified, "You have to have grapes in order to make wine." But absurd consequences would flow from construing the CC&Rs as prohibiting any business or commercial activity whatsoever irrespective of its effect on the residential character of the community.
*19 For example, some appellate attorneys work at home, reading records, doing research, and writing briefs, but meet with clients elsewhere. Although these attorneys are engaged in the business of practicing appellate law at their home offices, their business activities do not affect the residential character of their communities.
It would be absurd to construe the CC&Rs as prohibiting such harmless conduct, just as it would be absurd to construe them as prohibiting the Ketelhuts from operating their vineyard. " 'In construing a contract the court ... should adopt that construction which will make the contract reasonable, fair and just [citation]; ... [and] should avoid an interpretation which will make the contract ... harsh, unjust or inequitable [citations], or which would result in an absurdity [citations] ....' " ( Wright v. Coberly-West Co. (1967) 250 Cal.App.2d 31, 35-36, 58 Cal.Rptr. 213.)
There will be instances, of course, where a homeowner's activity constitutes prohibited business activity even though the business is primarily conducted off the residential premises. For example, if a homeowner conducted a trucking business off the premises except that the trucks were stored on the premises when not in use, the homeowner might be in violation of the business prohibition. The presence of the commercial trucks would detract from the community's residential character. (See Smart v. Carpenter (Ct.App. 2006) 139 N.M. 524, 134 P.3d 811.)
[ [/] ]***
Disposition
The judgment and postjudgment award of attorney fees and costs are affirmed. The parties shall bear their own costs on appeal.
I concur:
PERREN, J.
PERREN, J.
I concur.
In a vain effort to "define what may be indefinable," Justice Potter Stewart *581 opined, "I know it when I see it."[5] In like manner, the dissent "knows unfairness when [it] sees it" - when it sees how the Ketelhuts harvest their *20 grapes and make and sell their wine. The majority sees it otherwise. In my opinion this is not a matter for such subjectivity. Rather, we should defer to the good faith exercise of discretion and "the board's authority and presumed expertise." (Maj. opn. ante , at p. 578, citing Lamden v. La Jolla Shores Clubdominium Homeowners Assn. (1999) 21 Cal.4th 249, 265, 87 Cal.Rptr.2d 237, 980 P.2d 940.)
Both the majority and the dissent appeal to "Common sense." (Maj. opn. ante , at p. 577; dis. opn. post , at pp. 582-83.) In doing so they quote from Lamden : I join with them and set forth the full closing of that opinion:
"Common sense suggests that judicial deference in such cases as this is appropriate, in view of the relative competence, over that of courts, possessed by owners and directors of common interest developments to make the detailed and peculiar economic decisions necessary in the maintenance of those developments. A deferential standard will, by minimizing the likelihood of unproductive litigation over their governing associations' discretionary economic decisions, foster stability, certainty and predictability in the governance and management of common interest developments. Beneficial corollaries include enhancement of the incentives for essential voluntary owner participation in common interest development governance and conservation of scarce judicial resources." ( Lamden v. La Jolla Shores Clubdominium Homeowners Assn ., supra , 21 Cal.4th at pp. 270-271, 87 Cal.Rptr.2d 237, 980 P.2d 940, italics added.)
This dispute and the resulting expense and acrimony are strong testament to the wisdom of such deference.

The Eiths "posit that the 2/10/16 handwritten date appearing adjacent [to] the signature line [on the judgment] is suspect" and "therefore unreliable." The Eiths contend that the handwritten date "was likely backdated." (Capitalization and bold omitted.) We reject the contention because it is based on speculation. There is a "presumption that judicial duty is properly performed." (People v. Coddington (2000) 23 Cal.4th 529, 644, 97 Cal.Rptr.2d 528, 2 P.3d 1081, overruled on another ground in Price v. Superior Court (2001) 25 Cal.4th 1046, 1069, fn. 13, 108 Cal.Rptr.2d 409, 25 P.3d 618.) The Eiths have not overcome this presumption.

See footnote *, ante .

See footnote *, ante .

Jacobellis v. Ohio , (1964) 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793.