Filed 3/9/23  Doss v. Brehaut CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| GERALD DOSS et al., | |
| Plaintiffs and Respondents, | G060975 |
| v. | (Super. Ct. No. 30-2018-01020734) |
| SALLY L. BREHAUT, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Martha K. Gooding, Judge.  Affirmed in part, reversed in part and remanded with instructions.

Best Best & Krieger, Christopher E. Deal and Daniel L. Richards for Defendant and Appellant.

Borchard & Callahan, Janelle M. Dease and Thomas J. Borchard for Plaintiffs and Respondents.

## INTRODUCTION

We deal here with a particularly obdurate problem caused by a "zero lot line" design of a housing tract built by a developer apparently unfamiliar with human beings. The design has led to a minor problem which the human beings in this case have turned into a *casus belli*. We find ourselves generally – but not completely – in agreement with the trial court's efforts to stop the bleeding here and therefore reverse in part.

## FACTS

At first pass, one gets the impression that this case focuses on something called a swale – "a low-lying stretch of land," or "an elongated depression in land that is at least seasonally wet or marshy, is usually heavily vegetated, and is normally without flowing water." (Webster's 3d New Internat. Dict. (1981) p. 2305, col. 3.) And we shall shortly get to it. But it seems to us the true genesis of this dispute has its roots, so to speak, in a planning oddity. The feuding homeowners herein, respondents Gerald and Carolyn Doss and appellant Sally Brehaut, own lots in a Dana Point development called Regatta. Regatta's governing covenants, conditions and restrictions (CC&R's) state that the development was designed for single family residences using a "modified zero lot line" design. Pursuant to this design, the developer created dividing walls between neighboring properties called zero lot line walls. But in reality, these walls are not actually on each homeowner's lot line. Instead, the so-called zero lot line walls run five feet in from the lot line.[1] This means the *effective* boundary between properties (the wall) is not always the *legal* boundary between the properties (the lot line).

We can only conjecture why this is the case, but the day-to-day reality of Regatta's lot design means owners on the street in question, Palm Beach Court, have a

---

[1] We suppose this is why the developer called it a "modified" zero lot line design, though it is not entirely clear. Perhaps the residences themselves are built along the lot line but the yards do not follow the lot line for another reason. Our record is insufficient for us to know.

strip of land along the side of their yard, approximately five feet in width, which does not in fact belong to them. To get around this, the CC&R's grant each owner an easement to use the strip of land they do not own, ostensibly "for landscaping purposes only." Bookmark that phrase.

The Dosses bought their property located at 43 Palm Beach Court (the Doss property) as new construction in 1986 and have lived there continuously ever since. Brehaut bought the property next door at 45 Palm Beach Court (the Brehaut property) in 1998 from a previous owner, and has lived there ever since. The Brehaut property is directly to the south of the Doss property, and both backyards look out on Pacific Coast Highway. There is a wall that runs parallel to Pacific Coast Highway along both properties, fencing in the rear portion of the parties' backyards. We'll call this the rear wall.

The important wall for our purposes is the zero lot line wall separating the neighbors.[2] It sits *on the Doss property*, with an easement area extending five feet into the side yard of the Brehaut property. The zero lot line wall is approximately 20 feet in length and stretches from the southwest corner of the Dosses' residence to the rear wall. It is made of stucco and wood. The parties agree the zero lot line wall was not designed to be a retaining wall, but rather more of a barrier.

Within the easement area in Brehaut's backyard lies the aforementioned swale. It stretches the length of the zero lot line wall. The trial court concluded the swale had existed since Regatta's inception in 1986 and was part of the project's precise grading plan, serving a drainage function. But for most of the time Brehaut occupied her property, there were trees surrounding it and obscuring it from view. In early 2017, after receiving violation letters from the Regatta homeowners association (HOA) – apparently

---

[2] The parties and the court referred to this wall by varying names in the trial court below. More often than not, the Dosses referred to it as the "privacy wall." And even though Brehaut's counsel made clear his disagreement with this nomenclature, it seems to have been adopted by the trial court in its statement of decision. We stick to the name "zero lot line wall" in order to stay consistent with the designation used in the CC&R's.

spurred by complaints from the Dosses – Brehaut's nephew, Greg Tuley, cut the trees down.

Sometime in the spring of 2017, Tuley assisted his aunt with an approved remodel of her second floor deck. The Dosses noticed Tuley was filling in the swale with dirt and construction material excavated from the area where the deck's footings were to be poured. They were concerned about this because their understanding was the swale was not to be filled in. They voiced their concerns to Tuley, who refused to cease the activity. Tuley ultimately added about 18 to 24 inches of dirt to the swale.

The Dosses notified the HOA about Tuley's unapproved activity and the HOA asked Brehaut to return the area back to its original state. She did not. Instead, Tuley removed some, but not all, of the dirt he had dumped in the swale and piled it in a mound near its edge. The swale was now no longer smoothly graded or compacted, but rather bumpy and uneven.

A mediation was arranged between the Dosses and Brehaut and Tuley, who had power of attorney from his aunt for dealing with HOA matters. The HOA also engaged an engineering firm to evaluate the current state of the swale and suggest possible options for resolution of the issues. The engineering firm came up with three options. First, the zero lot line wall could be removed and replaced with an adequately constructed privacy/retaining wall. The Dosses were opposed to this option. Second, a sister retaining wall could be constructed on the easement area to support the new soil load created by Tuley's activities. Finally, Tuley and Brehaut could just remove the soil and restore the swale to its original condition. The parties did not agree on which option was best.

In May 2018, Brehaut and Tuley submitted an application to the HOA's architectural control committee (ACC), seeking to move forward with the second option, the sister retaining wall, which was their preferred option. The sister wall was intended to support the new soil load of the filled-in swale. Brehaut also proposed installing three

4

drains along the new wall and connecting them to the existing drain in the back of the yard. ACC reviewed the application "for its conformance to" the CC&R's as well as the HOA's rules and regulations. The application was also reviewed by ACC's own architect. In the process, ACC discovered the Dosses had installed an unapproved opaque canvas privacy curtain next to the zero lot line wall, partially obscuring the house and patio area.

The Dosses objected to the sister wall project because it did not return the zero lot line wall to its previous height and because they claimed it did not comply with the city code. Nevertheless, ACC approved Brehaut's application on June 29, 2018. ACC noted the Dosses had concerns about the project because the resulting soil elevation would allegedly compromise their privacy.[3] However, ACC concluded the Dosses' curtain solved that issue. ACC approved the privacy curtain and approved the sister wall project simultaneously. The Dosses' appeal of this decision was denied by the HOA's board of directors on August 8, 2018.

On September 24, 2018, the Dosses filed suit in Orange County Superior Court for injunctive and declaratory relief. They sought to enjoin Brehaut from filling in the swale and moving forward with the sister wall project. They also asked the court to declare Brehaut's project "invalid," "improper," and a violation of her easement. After a multi-day bench trial, the court found in favor of the Dosses, concluding Brehaut's easement did not allow her to fill in the swale or construct a sister retaining wall, as these activities did not amount to "landscaping."

## DISCUSSION

On appeal, Brehaut seeks de novo review of the trial court's interpretation of her rights under the CC&R's. She claims article III, sections 3 and 6 of the CC&R's grant her the right to fill in the swale and move forward with her project with ACC

---

[3] As ACC noted, the zero lot line wall was five feet tall, so if Brehaut or Tuley added two more feet of dirt on the easement area, it would effectively lower the height of the wall to three feet.

5

approval.  She also contends the trial court erred when it failed to give deference to ACC in approving her project.  While we agree Brehaut had the right to fill in the swale, we do not think her easement permits her to move forward with the sister wall project, even with ACC approval.  We therefore affirm in part and reverse in part.

**I.          Brehaut's Easement Under the CC&R's**

Article III of the CC&R's deals with zero lot line walls and the easements appurtenant to them.  Section 3 establishes the easements, stating: "Said easements shall be used for landscaping purposes only, and shall be subject to each and all of the covenants set forth" in the CC&R's.  The Dosses, as owners of the servient tenement, own the zero lot line wall and are responsible for painting and repairing the wall.  Brehaut, as owner of the dominant tenement, has "the right and responsibility to landscape and otherwise maintain the Easement Area . . . in a neat, clean, safe, sanitary, and attractive condition at all times, and shall bear all costs thereof."  However, she cannot "plant any tree, shrub, or other landscaping upon the Easement Area which would: (a) impair or otherwise threaten the structural integrity of any adjacent Residence; or (b) interfere with the [Dosses'] right of access . . . ."  And the Dosses supposedly have "an easement for ingress, egress and access on, over and across the Easement Area and [Brehaut's] Lot as may be reasonably necessary" for them to "paint, maintain and repair the Zero Lot Line Wall and" their home.

Our conjecture about the developer's rationale behind this plan has been fruitless, although we assume the rationale exists.  As configured, the lot design creates a tangled web of interconnected rights and obligations which are fecund ground for conflict.  And the CC&R's provide little help.  One neighbor has an easement supposedly "only" for "landscaping purposes," but she also has the right, nay, *obligation*, to "otherwise maintain" the easement area in a safe and attractive manner.  Yet no one saw fit to include a definition of "landscaping" in the CC&R's.  And while that same neighbor is responsible for maintaining the easement area, the CC&R's make the *other* neighbor

6

responsible for maintaining the zero lot line wall. To facilitate this, the CC&R's purport to give the Dosses an access easement over their own land – never mind that such a thing is a legal impossibility. (See Civ. Code, § 805 ["A servitude thereon cannot be held by the owner of the servient tenement."].)

The trial court was thus left to the unfortunate task of discerning the scope of Brehaut's easement – did it give her the ability to add soil to the swale and construct the sister wall? To answer this question, the trial court focused on the language of article III, section 3 of the CC&R's stating the zero lot line easements were to be used for "landscaping purposes only." It felt that Brehaut's activities did not fit within the definition of landscaping, they were not permissible. And viewing the CC&R's as a whole, as it was bound to do, the trial court discerned some clues. In its definition of an "improvement," the document separates the term "landscaping" from structures such as fences or retaining walls. Article III, section 6 of the CC&R's clusters the terms "trees" and "shrub" in with "other landscaping," indicating to the trial court that landscaping referred to plants. Additionally, the trial court noted, the Dosses' expert, Thomas Murphy, had testified that the word "landscaping" in real estate development is distinct from grading or retaining walls. But as rigorous as the trial court's analysis was, we cannot agree with it entirely.

First, the trial court did not consider the actual *definition* of landscaping, which is a gerund of the verb "landscape," meaning "to make a landscape of" or "to improve by landscape architecture or gardening." (Webster's 3d New Internat. Dict. (1981) p. 1269, col. 2.) In noun form, the word "landscape" refers to the surface of the earth or landforms of the region. (*Ibid.*) The plain, everyday meaning of the word "landscaping" therefore, entails not just plants, but also manipulation and upkeep of the soils in which they are situated.

Given the usage of the term "landscaping" in the CC&R's, however, the trial court was left with the impression that the developer intended landscaping to refer

7

specifically to vegetation. But even if this were the case, the scope of the easement was not limited to "landscaping," but to "landscaping *purposes*."

"The grant of an easement must 'be interpreted liberally in favor of the grantee.' (*Norris v. State of California ex rel. Dept. Pub. Wks*. (1968) 261 Cal.App.2d 41, 46–47, citing Civ. Code, § 1069.) When an easement is based on a grant, as it is here, the grant gives the easement holder both 'those interests expressed in the grant and those *necessarily incident thereto*.' (*Pasadena v. California–Michigan etc. Co.* (1941) 17 Cal.2d 576, 579.) 'Every easement includes what are termed "secondary easements;" that is, the right to do such things as are necessary for the full enjoyment of the easement itself.' (*North Fork Water Co. v. Edwards* (1898) 121 Cal. 662, 665–666.)" (*Dolnikov v. Ekizian* (2013) 222 Cal.App.4th 419, 428, italics added.) Brehaut was not only entitled to use her easement to make plantings, but also to do any activity incidental or preliminary to making plantings, including adding soil or grading the area to make it amenable to planting, assuming she followed all related protocols.[4]

As already stated, Brehaut's easement is "subject to each and all of the covenants set forth in" the CC&R's. The Dosses claim the "subject to" language in section 3 of the CC&R's cannot be read to expand Brehaut's easement beyond its "landscaping only" scope. As we have already explained, Brehaut's easement is not just for landscaping, but for landscaping *purposes* and anything incidental to landscaping purposes; so it is not accurate to describe it as a "landscaping only" easement. But beyond that, we think the Dosses and the trial court read the easement grant too narrowly. It was not just contained in section 3, but also in section 6 of the CC&R's. Such is the import of the phrase "subject to." When used in adjectival form, the phrase means "having a contingent relation to something and usu[ally] dependent on such relation for

---

[4] Indeed, one wonders at the limitations of creating a garden, or planting trees or shrubs, in a swale. It seems some sort of grading change would be required in order to allow Brehaut to freely exercise her easement instead of having trees or shrubs at the edge of the swale, as had existed until the Dosses complained to the HOA about them.

8

final form, validity, or significance." (Webster's 3d New Internat. Dict. (1981) p. 2275, col. 3.) Any interpretation of section 3 must reconcile with section 6 and the remainder of the CC&R's, and not the other way around.[5]

The sister wall, however, is a different matter. Reasonable minds might differ as to whether a retaining wall can have a landscaping purpose (we think it can), but the question is ultimately irrelevant. "No authority need be cited for the well-known rule that the owner of a dominant tenement must use his casement and rights in such a way as to impose as slight a burden as possible on the servient tenement." (*Baker v. Pierce* (1950) 100 Cal.App.2d 224, 226.) The easement holder is not entitled to unduly burden the servient tenement or impede the landowner's ability to use his or her property consistently with the easement. (See *White v. Walsh* (1951) 105 Cal.App.2d 828, 832.) It is also "well settled that the burden of the dominant tenement cannot be enlarged to the manifest injury of the servient estate by any alteration in the mode of enjoying the former; nor can the owner thereof commit any trespass upon the servient tenement beyond the limits fixed by the grant (*North Fork Water Co. v. Edwards* [*, supra,*] 121 Cal. 662); nor can the limitations in the exercise of the easement be changed at the pleasure of the grantee (*Winslow v. City of Vallejo* [(1906)] 148 Cal. 723 . . . .) It is equally well settled that the grantee of a right of way over another's land merely has the privilege of passing over the land in some particular line (*Kripp v. Curtis* [(1886)] 71 Cal. 62), and that he acquires no ownership in the fee of the soil (*City and County of San Francisco v. Calderwood* [(1867)] 31 Cal. 585)." (*Fletcher v. Stapleton* (1932) 123 Cal.App. 133, 137.)

---

[5] If it *were* the other way around, we would have expected to see language in section 6 making it "subject to" section 3. Based on the CC&Rs' plain language, as between sections 3 and 6, section 3 must give way. We therefore must disagree with the trial court's view that Brehaut's planned project would "read out of the CC&R's the express provision limiting" her use of the easement to landscaping. Section 3 is not being "read out"; it is subservient to section 6 seemingly by the drafters' design.

Here, the sister wall would sit approximately one inch away from the zero lot line wall and would rise to a height of three feet. There can be no doubt this would impede the Dosses' ability to use the area, *which sits on their own property*, for any purpose, whether it be strolling the area to admire the view or accessing the other side of the zero lot line wall to carry out maintenance or repair, per their obligation under the CC&R's. Out of the three options provided by the HOA's engineer, the retaining wall seems to be among the most burdensome.

True, Brehaut must maintain the easement area in a safe and neat condition under section 6 of the CC&R's. But more importantly for our analysis, she cannot plant anything which would affect the structural integrity of the Dosses' home or impede their access to the zero lot line wall. As we've already noted, the sister wall would surely impede the Dosses' access to the zero lot line wall. And as such, it would unquestionably exceed the scope of Brehaut's easement.

It hardly matters that the sister wall was approved by ACC. We need not, as Brehaut argues, defer to ACC's decision-making here because "[w]e do not defer to the Board's interpretation of the CC&Rs. The interpretation of CC&R's is a legal question to be decided by the courts, not the Board." (*Eith v. Ketelhut* (2018) 31 Cal.App.5th 1, 17.) Neither ACC nor the HOA had the authority or discretion to expand the scope of Brehaut's easement, which is essentially what they did when they approved her sister wall project over the Dosses' objection.

Nonetheless, ACC approval will certainly prove important going forward in determining the propriety of any activity Brehaut might conduct on the easement area which is within the scope of her easement grant. There is a sentence in section 6 of the CC&R's prohibiting either Doss or Brehaut from constructing any improvements on the easement area without express ACC approval, meaning, if either the Dosses or Brehaut *has* express ACC approval to construct an improvement, they may build it on the easement area.

10

The Dosses seem to take exception to this proof by contrapositive, arguing that section 6 of the CC&R's only describes what Brehaut may *not* do *without* ACC permission, not what she *may* do *with* ACC permission. This interpretation strains logic – and renders language in section 6 of the CC&R's nugatory. If it were impermissible for Brehaut to ever build an improvement on the easement area, why even mention ACC approval in the first place?[6] While nothing about these CC&R's is clear, it seems to us, ACC's approval is a litmus test of sorts.

We are left here with the impression that many opportunities were missed to resolve the dispute short of a lawsuit. That lawsuit having accomplished little except the production of *Agida*, we return the matter to the parties with the hope that neighbors can accomplish what lawyers could not: a workable compromise.

## DISPOSITION

The judgment is reversed as to Brehaut's act of filling in the swale but affirmed as to Brehaut's proposed sister wall project. The matter is remanded to the trial

---

[6] The trial court concluded Brehaut would only be allowed to build an improvement which constitutes landscaping – plants. As Brehaut argues, this is not a credible interpretation of the term "improvements" as defined in the CC&R's – "*all structures and appurtenances thereto of every kind*, including, but not limited to, Residences, garages, open parking areas, pavement, sidewalks, driveways, fences, Project perimeter walls, retaining walls, patios and patio railings, decks and deck railings, recreation area *and all related* amenities, *landscaping* and all Association Maintenance Areas." (Italics added.)

11

court with instructions to hold further proceedings and enter judgment consistent with this opinion.  The parties shall bear their own costs on appeal.


                                        BEDSWORTH, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


MOTOIKE, J.


12