Filed 7/29/21  Intuit Inc. v. 9,933 Individuals CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| INTUIT INC. et al., <br><br>     Plaintiffs and Appellants, <br><br>     v. <br><br> 9,933 INDIVIDUALS, <br><br>     Defendants and Respondents. | B308417 <br><br> (Los Angeles County Super. Ct. No. 20STCV22761) |

APPEAL from an order of the Superior Court of Los Angeles County, Terry A. Green, Judge.  Affirmed.

Fenwick & West, Rodger R. Cole and Molly R. Melcher; Wilmer Cutler Pickering Hale and Dorr, Matthew Benedetto,

Jonathan E. Paikin, Daniel S. Volchok, and Kevin M. Lamb for Plaintiffs and Appellants.

Mayer Brown and Archis A. Parasharami for the U.S. Chamber of Commerce as Amicus Curiae on behalf of Plaintiffs and Appellants.

Keller Lenkner and Warren Postman; Custis Law and Keith A. Custis for Defendants and Respondents.

\* \* \* \* \* \*

The parties in this case have not just been forum shopping; they have been on a veritable shopping spree. When customers who purchased a tax preparation and e-filing program sued the software manufacturer in federal class actions, the manufacturer successfully moved to compel individual arbitration of their claims. When the customers then filed demands for arbitration and the manufacturer realized that its arbitration agreement precluded class arbitration, the manufacturer found itself facing 40,000 individual arbitrations, each with at least a $3,200 price tag in arbitration fees owed by the manufacturer. So the manufacturer filed a lawsuit in state court and then moved for a preliminary injunction to halt the arbitrations and to push each arbitration into small claims court. While the state lawsuit was pending, the customers filed a lawsuit in federal court seeking to compel arbitration in light of the federal antitrust claims they had added to their arbitration demands. The federal court declined to intervene, leaving the matter in state court. The state court thereafter denied the motion for a preliminary

2

injunction.  The manufacturer has appealed that denial.  We conclude the denial was correct, and accordingly affirm.

## FACTS AND PROCEDURAL BACKGROUND

I.     **Facts**

A.     *The Underlying Allegations*[1]

Intuit Inc. and its subsidiary, Intuit Consumer Group LLC (collectively, Intuit) is the maker of the online tax preparation and e-filing software TurboTax.  Fearing that the Internal Revenue Service (IRS) would start offering similar services for free, Intuit and others in that industry formed a consortium and agreed to provide free online tax preparation and e-filing services to qualifying, low-income taxpayers as long as the IRS stayed out of the industry.  Intuit then did a "bait and switch":  Intuit lured consumers to its TurboTax website with the promise of free software (called the "Freedom Edition"), but once consumers got to the website, Intuit (1) made it nearly impossible to locate the free software, (2) informed consumers that they only qualified for its paid software (called the "Free Edition"), and then (3) sold consumers that paid software.

B.     *Terms of service*

Consumers who use TurboTax software may do so only after they click that they accept Intuit's terms of service.

The terms of service contain an arbitration agreement mandating the arbitration of "ANY DISPUTE OR CLAIM RELATING IN ANY WAY TO THE SERVICES OR THIS AGREEMENT."  The arbitration agreement has three carve-outs or limitations:  (1) it provides that "*you*"—which the terms of service elsewhere implicitly define as being the consumer because "we," "our" or "us" refers to

---

[1]     We accept these allegations as true for purposes of this opinion.

3

Intuit—"may assert claims in small claims court if *your* claims qualify";[2] (2) it provides that "*any party* to the arbitration may at any time seek injunctions or other forms of equitable relief from any court of competent jurisdiction"; and (3) it provides that "WE *EACH* AGREE THAT ANY AND ALL DISPUTES MUST BE BROUGHT IN THE PARTIES' INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING." (Italics added.)

The terms of service also provide that any arbitration will be conducted by the American Arbitration Association (AAA) and "under the AAA's rules."

### C. *Lawsuits, arbitration demands, and maneuvers among fora*

#### 1. *Federal class actions*

Consumers filed several class actions in federal court against Intuit challenging its concealment of the free TurboTax software and its redirection toward the paid software. After the actions were consolidated, Intuit moved to compel individual arbitration with the named plaintiffs pursuant to the agreement to arbitrate set forth in the terms of service. The court eventually granted that motion.

#### 2. *Multiplicity of arbitration demands*

Bounced out of federal court, approximately 40,000 TurboTax consumers then filed individual arbitration demands

---

2    Verbatim, this provision reads:
     "ANY DISPUTE OR CLAIM RELATING IN ANY WAY TO THE SERVICES OR THIS AGREEMENT WILL BE RESOLVED BY BINDING ARBITRATION, RATHER THAN IN COURT, except that *you* may assert claims in small claims court if *your* claims qualify."
(Italics added.)

4

with the AAA.[3]  The demands were filed in three waves—in October 2019, January 2020, and March 2020—by a single law firm.  Another 85,000 individual demands may be waiting in the wings.

To initiate arbitration with the AAA, a consumer must pay a nonrefundable $200 filing fee to file its demand.  Per the arbitration agreement, Intuit must pay the remaining AAA-set fees—a nonrefundable $300 fee to file a response to the demand, another $2,900 in fees to litigate the demand, and another $1,500 if the litigation requires a telephonic or in-person hearing.  It therefore costs Intuit either $3,200 or $4,700 to litigate each demand, which is typically in excess of the amount sought by each consumer.  Even if all 40,000 arbitrations are conducted without hearings, the total cost to Intuit would be $128 million.

The law firm representing the consumers has sought to reach a global settlement with Intuit.

To avoid the staggering cost of arbitrating each individual arbitration demand, Intuit requested that the AAA administratively close the vast majority of the pending arbitrations so they could be litigated in small claims court.[4]  In making this request, Intuit argued that the arbitration agreement in the terms of service incorporates the AAA's rules, that rule 9 of the AAA's Consumer Arbitration Rules (consumer rules) grants *either party* the right to opt out of the arbitral forum if a claim otherwise meets the jurisdictional prerequisites for small claims court, and that rule 9 obligates the AAA to

---

[3]     The consumers' counsel subsequently withdrew a subset of the demands.

[4]     Intuit did not make this request with regard to a handful of the consumers' demands.

5

administratively close any qualifying arbitrations upon request if they have not yet been assigned to an arbitrator. The consumers objected to Intuit's requests. After a barrage of increasingly blistering letters from Intuit, the AAA ruled—and thereafter reaffirmed its ruling—that the decision whether to send each consumer's demand to small claims court was a question of arbitrability to be decided by the arbitrator in each case.

### 3. *Intuit's state court lawsuit*

In June 2020, Intuit filed a declaratory relief action in Los Angeles Superior Court against 9,933 consumers from the first and second waves of demands filed with the AAA seeking a declaration that the consumers' claims belonged in small claims court, and not in arbitration.

### 4. *The consumers' federal claims and federal court action*

In July and August 2020, the consumers amended their arbitration demands to add claims for violations of the federal Sherman Act (15 U.S.C. § 1 et seq.).

Immediately thereafter, the consumers sued Intuit in federal court to compel arbitration and to stay Intuit's declaratory relief action. The federal court dismissed the consumers' petition to compel arbitration: Although the court found one of the consumers' antitrust theories not to be frivolous (namely, that Intuit had violated federal law by "engag[ing] in unlawful price fixing" by "colluding with its competitors to hide the" free services), the court nevertheless declined to exert jurisdiction "in deference to [the] earlier-filed state suit."

## II. Procedural Background

As noted above, Intuit filed a declaratory relief action against thousands of the consumers who filed the first and second

waves of arbitration demands.[5]  The action sought declarations that (1) Intuit was contractually entitled to have AAA administratively close the pending arbitrations because rule 9 of the consumer rules granted *Intuit* the right to elect to proceed in small claims court, (2) the statutes enacted as part of Senate Bill No. 707 (SB 707) were preempted by the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.) because they discourage arbitration by mandating penalties against businesses (and employers) who do not pay arbitration fees within 30 days of the date they are due (Code Civ. Proc., § 1281.97 et seq.), and (3) the consumers' newly added Sherman Act claims constitute a "de facto class action" that is barred by the class action waiver contained in the terms of service's arbitration agreement.

On September 2, 2020, Intuit filed a motion for a preliminary injunction to enjoin the pending arbitrations. Specifically, Intuit argued that it was likely to prevail on the merits of its first two declaratory relief claims.  Intuit further argued that it will suffer irreparable harm if the consumers' arbitrations are not enjoined because it faces "a stark, no-win choice" of either paying millions of dollars in arbitration fees under the threat of SB 707 penalties or "pay[ing] a massive [global] settlement" of claims it vehemently disputes.

After full briefing and a hearing, the trial court issued a 16-page order denying Intuit's motion for a preliminary injunction. As a threshold matter, the court determined that it had jurisdiction to entertain Intuit's motion because the arbitration

---

[5]    Intuit later filed a first amended complaint that added as defendants 31,054 of the consumers who had filed third-wave arbitration demands and whose arbitrations Intuit had asked the AAA to administratively close.

agreement authorized either party to "seek injunctions or other forms of equitable relief from any court of competent jurisdiction." On the merits, the court concluded that Intuit was not likely to prevail on the two claims for relief it advanced in its motion. First, the court ruled that Intuit was unlikely to prevail on its contract-based claim for relief because (1) the "plain" text "of the [t]erms of [s]ervice leads to the conclusion that only the [c]onsumers"—and not Intuit—"have the right to take a case to small claims court," and there was no "conflict" between that text and consumer rule 9(b) insofar as the more specific text in the terms of service "modified" rule 9(b), and (2) the consumers' newly added Sherman Act claims precluded removal of their arbitrations to small claims court because those federal law claims were outside the jurisdiction of that court, those claims were not to be dismissed as the fruit of improper forum shopping, and the trial court declined to decide whether the individual Sherman Act claims constituted a de facto class action when considered in the aggregate. Second, the trial court ruled that Intuit was unlikely to prevail on its preemption claim because that claim was "certainly not ripe." Because the thrust of Intuit's argument is that SB 707's penalties for late payment discouraged arbitration, that argument was not ripe because Intuit "has not yet blown any of its fee deadlines" and there was no "reason to believe that it [would] do so in the future." Alternatively, the court noted that Intuit also would not prevail on the merits because the "proper remedy" flowing from SB 707's invalidation would be to "enjoin the *sanctions*" mandated by SB 707, not to "halt the *arbitration*[*s*]." In light of its conclusion that Intuit was unlikely to prevail on the merits, the court found no occasion to balance the harms of granting or denying injunctive relief.

8

Intuit filed this timely appeal.

## DISCUSSION

Intuit asserts that the trial court erred in denying its motion for a preliminary injunction. To obtain such relief, the moving party must show that (1) it "is likely to prevail on the merits at trial," and (2) the likely "'interim harm'" to the moving party "if [the] injunction is denied is greater than 'the [likely interim] harm [to] the [opposing party]'" "if the . . . injunction is issued." (*Integrated Dynamic Solutions, Inc. v. VitaVet Labs, Inc.* (2016) 6 Cal.App.5th 1178, 1183; *O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1481 [burden rests on movant]; see Code Civ. Proc., § 527, subd. (a).) The showings operate on a sliding scale: "[T]he more likely it is that [the moving party] will ultimately prevail, the less severe must be the harm that [it] allege[s] will occur if the injunction does not issue." (*King v. Meese* (1987) 43 Cal.3d 1217, 1227.) Although the denial of a preliminary injunction is generally reviewed for an abuse of discretion, we independently review the specific question presented here—that is, whether Intuit has carried its burden of showing a likelihood of prevailing on the merits when that determination turns on the application of the law to undisputed facts. (*City of Vallejo v. NCORP4, Inc.* (2017) 15 Cal.App.5th 1078, 1085.)

Because Intuit's motion for injunctive relief is premised on its contract and preemption claims in its complaint, our analysis of whether the trial court erred in determining that Intuit was unlikely to prevail on the merits of those claims boils down to three questions: (1) Do the terms of service give Intuit the contractual right to push the consumers' pending arbitrations into small claims court?; (2) Does the consumers' addition of

9

Sherman Act claims to the arbitrations constitute a de facto class action that warrants outright dismissal of those federal claims?; and (3) Is Intuit's preemption challenge to SB 707 ripe for adjudication? As described in detail below, we conclude the answer to all three questions is, "No."

## I.     Interpretation of Arbitration Agreement

Intuit asserts that it has the contractual right, under the terms of service, to elect to send the consumers' individual arbitrations to small claims court. Intuit's assertion rests on the following chain of logic: (1) the terms of service incorporate "the AAA's rules"; (2) the AAA's consumer rules are the pertinent AAA rules; (3) (a) rule 9(b) of the consumer rules provides that (i) "*either* party may choose to take" a "claim" to "small claims court" if that "claim is within the jurisdiction of a small claims court," and (ii) if that choice is made "before [an] arbitrator is formally appointed," the AAA must "administratively close the case"; and (b) (i) rule 1(d) of the consumer rules provides that the AAA will only arbitrate disputes if the governing arbitration agreement "substantially and materially complies with" the AAA's Consumer Due Process Protocol (due process protocol); and (ii) the due process protocol states that consumer arbitration agreements "should make it clear that *all parties* retain the right to seek relief in a small claims court for disputes or claims within the scope of its jurisdiction." (Italics added.)

Because arbitration is a matter of contractual consent between the parties (*Douglass v. Serenivision, Inc.* (2018) 20 Cal.App.5th 376, 386 (*Douglass*)), and because the arbitration agreement specifies the use of California law, we apply California's general contract principles to interpret the terms of service (*Sandquist v. Lebo Automotive, Inc.* (2016) 1 Cal.5th 233,

10

243-244, overruled on other grounds by *Lamps Plus, Inc. v. Varela* (2019) 139 S. Ct. 1407, 1417-1419 (*Lamps Plus*); see *Lamps Plus*, at p. 1415). We independently interpret the terms of service, and are not bound by the trial court's interpretation. (*Gribaldo v. Agrippina Versicherunges A.G.* (1970) 3 Cal.3d 434, 445-446; *Alvarez v. Altamed Health Services Corp.* (2021) 60 Cal.App.5th 572, 581; *Valencia v. Smyth* (2010) 185 Cal.App.4th 153, 161-162.)

### A. *Analysis*

The plain text of the arbitration agreement in the terms of service is ambiguous on the question of *who* may elect to push an arbitration into small claims court. That is because the text is subject to two reasonable constructions. (*Powerline Oil. Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390 [a contract ""will be considered ambiguous when it is capable of two or more [reasonable] constructions""].)

On the one hand, the text provides that "*you* may assert claims in small claims court if *your* claims qualify." (Italics added.) Applying plain English, the use of the word "you" refers solely to the consumer—not to Intuit. (*Thompson v. Ford of Augusta, Inc.* (D.Kan., Feb. 15, 2019, No. 18-2512-JAR-KGG) 2019 U.S. Dist. Lexis 24659, *2-*3, *14-*15 (*Thompson*) [arbitration agreement saying "you may bring in small claims" refers solely to consumer, not to the business]; see generally, *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 (*AIU Ins. Co.*) [contracts are to be interpreted according to their terms' "'ordinary'" and "'clear and explicit meaning"]; *Greenspan v. LADT, LLC* (2010) 185 Cal.App.4th 1413, 1437 (*Greenspan*) [same]; Civ. Code, §§ 1639 [ascertain parties' intention from writing of contract], 1644 ["words of a contract are to be

11

understood in their ordinary and popular sense"].)  The plain meaning of this provision is only reinforced when it is contrasted with other provisions of the terms of service that use the phrases "any party," "we," and "you and Intuit" when seeking to convey that the provision applies to both the consumer *and* Intuit. (*Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1186 [where a contract uses different words in different places, those different words connote different meanings]; *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 753 [same].)

On the other hand, the terms of service's text incorporates the AAA rules, and the consumer rules—both in rule 9(b) and through compliance with the due process protocol—specify "*either* party may take the claim to" "small claims court."  (Italics added.) Connecting the dots in this fashion ostensibly leads to the conclusion that either the consumer *or Intuit* may move qualifying claims into small claims court.

These two contrary readings of the text create an "inconsisten[cy]"—and hence an ambiguity—"on the issue of which party may initiate a small claims court action." (*Thompson, supra,* 2019 U.S. Dist. LEXIS 24659, at p. *17.)

We conclude that this ambiguity must be resolved in favor of reading the terms of service to permit only the consumer to transfer a claim to small claims court, and we reach this conclusion for two reasons.

First, this is the result dictated by the well-settled maxim that "ambiguities about the scope of an arbitration agreement must be resolved in favor of arbitration."  (*Lamps Plus, supra,* 139 S.Ct. at p. 1418; *Mastrobuono v. Shearson Lehman Hutton*

12

(1995) 514 U.S. 52, 62 (*Mastrobuono*); accord, *Greenspan, supra,* 185 Cal.App.4th at p. 1437; *Kennedy, Cabot & Co. v. National Assn. of Securities Dealers, Inc.* (1996) 41 Cal.App.4th 1167, 1175.)  Here, construing the text to empower only one party—rather than both—to move cases out of arbitration is the construction that keeps more cases in arbitration and hence the construction that "favor[s] . . . arbitration."

Second, this is also the result counseled by the maxim that an "irreconcilable conflict" between a more general policy (here, the more general AAA consumer rules) and a more specific "slip" or "rider" (here, the more specific terms of service) is to be resolved in favor of the more specific provision.  (*Burch v. Hartford Fire Ins. Co.* (1927) 85 Cal.App. 542, 551.)

Because the terms of service only empower a consumer to elect whether to move an arbitration to small claims court, the trial court did not err in concluding that Intuit was unlikely to succeed in asserting a contrary construction of the terms of service.

**B.    *Intuit's further arguments***

Intuit offers what boils down to five arguments challenging our interpretation of the terms of service.

First, Intuit argues that AAA consumer rule 9(b) is incorporated into the terms of service's arbitration agreement "as though recited verbatim" (*King v. Larsen Realty, Inc.* (1981) 121 Cal.App.3d 349, 357; *Republic Bank v. Marine Nat. Bank* (1996) 45 Cal.App.4th 919, 923; *Shaw v. Regents of Univ. of Cal.* (1997) 58 Cal.App.4th 44, 54 (*Shaw*)), and must be "give[n] effect" (Civ. Code, § 1641).  This is correct, but ultimately unhelpful.  It is rule 9(b)'s incorporation into the agreement that renders the agreement inconsistent with its other provisions and hence

13

ambiguous—but the fact of rule 9(b)'s incorporation does not *resolve* that ambiguity. Instead, the maxims set forth above do.

Second, Intuit argues there is no inconsistency between rule 9(b)'s grant of a bilateral right to move to small claims court and the language in the terms of service granting the consumers a unilateral right to do so. That is because, according to Intuit, Intuit was required by the AAA's due process protocol to include the language in the terms of service stating "*you* may assert claims in small claims court" in order to provide consumers *notice* of their right to do so, such that the language operates solely as a notice provision and not to define the parties' rights and obligations under the terms of service. To be sure, the due process protocol recommends giving "notice of the option to make use of applicable small claims court procedures," and provides a sample arbitration agreement with language similar to the language used here because the sample reads, "*You* . . . GIVE UP YOUR RIGHT TO GO TO COURT to assert or defend your rights under this contract (EXCEPT for matters that may be taken to SMALL CLAIMS COURT)." (Italics added.)

We nevertheless reject Intuit's argument. To begin, a central premise of Intuit's argument—namely, that Intuit was *required* by the due process protocol to include the "*you* may assert" language—is false. (*Winslow v. D.R. Horton America's Builder* (Tex.App., May 29, 2013, No. 04-12-00376-CV) 2013 Tex.App. Lexis 6488, at *2 (*Winslow*) [merely "self-regulated and not mandatory"]; *Dalton v. Santander Consumer United States, Inc.* (N.M. 2016) 2016-NMSC-035 [385 P.3d 619, 625] [merely "guiding . . . principles"]; accord, *Pack v. Damon Corp.* (E.D.Mich. 2004) 320 F.Supp.2d 545, 557 [rejecting argument that failure to comply with suggested notice provisions rendered arbitration

14

agreement unenforceable], revd. in part on another ground (6th Cir. 2006) 434 F.3d 810; *McNamara v. Samsung Telecommunications America, LLC* (N.D.Ill., Nov. 3, 2014, No. 14 C 1676) 2014 U.S. Dist. Lexis 155520, at *8 [same].) Further, and more to the point, we may "give effect to every part" of a contract—and, thus, may treat the "*you* may assert" language as solely a notice provision—only if it is "reasonably practicable" to do so. (Civ. Code, § 1641; *People v. Doolin* (2009) 45 Cal.4th 390, 413, fn. 17 [same].) Here, it is not. We must read contracts from an objective "layperson['s]" point of view (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18; accord, *AIU Ins. Co.*, *supra*, 51 Cal.3d at p. 822), and it is implausible that an objective consumer reading the terms of service would travel down the long and winding road offered by Intuit in order to read the "*you* may assert" language as merely a notice provision—that is, (1) that the terms of service incorporate the AAA's rules; (2) that the applicable AAA rules are the consumer rules; (3) that the consumer rules incorporate the due process protocol; (4) that the due process protocol recommends giving consumers notice of their right to move a case to small claims court; and (5) that the language therefore does not mean what it actually says (namely, that only a consumer may move to small claims court) because the language is meant solely to give notice.

Third, Intuit argues that if there *is* any inconsistency between the terms of service and rule 9(b), that inconsistency must be resolved in favor of rule 9(b) because rule 9(b)'s rule allowing both parties to move cases to small claims court is mandated by the due process protocol. We reject this argument. To begin, the central premise of this argument is also that compliance with the due process protocol is mandatory; as noted

15

above, this premise is incorrect.  Even if the due process protocol were mandatory, using it as a tiebreaker to expand the rights of businesses and employers is at odds with its fundamental function of "benefit[ting]" and "protect[ing]" *consumers*.  (*Jenkins v. First American Cash Advance of Georgia, LLC* (11th Cir. 2005) 400 F.3d 868, 879.)  Lastly, the AAA has thus far implicitly determined that rule 9(b) is not controlling to the arbitrations at issue in this case and that the consumers' arbitrations nonetheless still comply with the due process protocol because it has accepted the cases for arbitration (which it cannot do without determining that arbitration pursuant to the agreement "substantially and materially complies" with the protocol (*Winslow*, *supra*, 2013 Tex.App. Lexis 6488, at *2)) and because it has refused to administratively close the arbitrations.

Fourth, Intuit argues that the trial court was wrong to conclude that the language set forth in the terms of service *modified* rule 9(b) of the consumer rules because any modifications of the AAA's rules incorporated into the agreement must be done more explicitly, preferably through language like, "Notwithstanding the AAA rules . . ."  For support, Intuit cites *RLI Ins. Co. v. Kansa Reinsurance Co.* (S.D.N.Y., Nov. 14, 1991, No. 91 Civ. 4319 (MBM)) 1991 U.S. Dist. Lexis 16388 (*RLI*).  We reject Intuit's argument for several reasons.  To begin, the trial court's modification-based rationale is irrelevant because it does not underlie *our* analysis; as noted above, our analysis turns on the inconsistency between rule 9(b) and the express language of the terms of service and resolves that inconsistency using longstanding maxims of contract construction.  (E.g., *People v. Zapien* (1993) 4 Cal.4th 929, 976 [noting "firmly established" rule that appellate courts review the trial court's ruling, not its

16

rationale].) Further, even if the modification rationale were relevant, and even if we assume for the sake of argument that a modification must be explicit, the modification here *is* explicit: The unilateral language "*you* may assert claims in small claims court" set forth in the terms of service explicitly modifies rule 9(b)'s bilateral language "*either* party may choose to take" a "claim" to "small claims court." (*Mastrobuono*, *supra*, 514 U.S. at p. 57 ["parties are generally free to structure their arbitration agreements as they set fit"]; accord, *Lamps Plus*, *supra*, 139 S. Ct. at p. 1415 [courts must "'enforce arbitration agreements according to their terms'"].) The absence of the "Notwithstanding the AAA rules" language Intuit prefers does not make the otherwise clear modification any less clear. Contrary to what Intuit asserts, *RLI* does not erect a higher standard for modification. *RLI* held that the parties' arbitration agreement did not alter the AAA rules they had incorporated into it, but that was because the agreement was wholly "silent" as to the provision allegedly modified; *RLI* noted that the parties could have modified the incorporated AAA rules either by "explicitly repudiat[ing]" the rules *or* by "explicitly alter[ing] [those rules] by the inclusion of their own terms in the" agreement. (*RLI,* at *2-*3, *7.) Here, the parties took the latter route.

Lastly, Intuit argues that interpreting the terms of service in a manner that denies Intuit a right to move cases to small claims court leads to absurd results and must therefore be avoided. Although interpretations leading to absurd results are generally to be avoided (Civ. Code, § 1638; *Eith v. Ketelhut* (2018) 31 Cal.App.5th 1, 19; *Segal v. Silberstein* (2007) 156 Cal.App.4th 627, 634-635), this maxim is not implicated here. Intuit begins by contending that it makes no sense for it to forego the right to

17

litigate in small claims court when the damages consumers typically seek (given the relatively low cost of TurboTax) will typically be far less than the $3,200 or more Intuit would have to pay for arbitration.  However, this imbalance between a consumer's typical recovery and Intuit's typical cost exists only because Intuit has also insisted upon individual arbitration rather than class arbitration; were class arbitration possible, the amount at issue would be vastly larger and the relative cost of arbitration a bargain.  An unwise outcome is not an absurd result, as courts are not in the business of rewriting contracts to relieve parties like Intuit from bad deals they drafted for themselves.  (*Series AGI West Linn of Appian Group Investors DE, LLC v. Eves* (2013) 217 Cal.App.4th 156, 164; *Walnut Creek Pipe Distributors, Inc. v. Gates Rubber Co. Sales Div.* (1964) 228 Cal.App.2d 810, 815.)  Intuit also contends that it makes no sense for it to forego the right to litigate in small claims court because, according to a law review article, consumers win more often in small claims court than they do in arbitration.  Aside from the fact that law review articles are not competent evidence (see, e.g., *People v. Wilcox* (2013) 217 Cal.App.4th 618, 626), we do not see how it is absurd for Intuit to give up the right to move to a venue where it is more likely to lose.

## II.    De Facto Class Action

Intuit next asserts that the trial court's alternate rationale for concluding that Intuit was unlikely to succeed on the merits of its contract-based claim—namely, that the consumers' newly added Sherman Act claims preclude transfer of the arbitration demands to small claims court because those federal claims fall outside the jurisdiction of small claims court—is also incorrect. Specifically, Intuit asserts that (1) the 9,933 consumers'

18

simultaneous assertion of Sherman Act claims all seeking the same injunctive relief amount to a single, "de facto" class action,[6] and (2) the arbitration agreement in the terms of service explicitly require "ALL DISPUTES" to be "BROUGHT IN THE PARTIES' INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION."  For support, Intuit cites several cases holding that individual consumers' identical federal antitrust claims under the Clayton Act (15 U.S.C. § 12 et seq.) to enjoin the merger between AT&T and T-Mobile amounted to a class action barred by an arbitration agreement.  (*AT&T Mobility LLC v. Bernardi* (N.D.Cal., Oct. 26, 2011, Nos. C 11-03992 CRB, C 11-04412 CRB) 2011 U.S. Dist. Lexis 124084, at *17-*23; *AT&T Mobility LLC v. Fisher* (D.Md., Oct. 28, 2011, No. DKC 11-2245) 2011 U.S. Dist. Lexis 124839, at *11-*13; *AT&T Mobility LLC v. Smith* (E.D.Pa., Oct. 6, 2011, No. 11-cv-5157) 2011 U.S. Dist. LEXIS 125367, at *3-*4 (*Smith*).)

This assertion is unpersuasive for four reasons.

First, Intuit's challenge to the trial court's alternate rationale has no effect on the affirmative analysis in this opinion.

Second, the trial court specifically declined to rule on Intuit's argument that the Sherman Act claims constituted an impermissible de facto class action after Intuit represented that it was not seeking preliminary injunctive relief on that basis.

---

**6**     Intuit also makes passing references to the consumers' addition of California unfair competition law claims for injunctive relief (Bus. & Prof. Code, § 17200 et seq.), for which California's small claims courts also lack jurisdiction (Code Civ. Proc., §§ 116.220, 116.221 [delineating jurisdiction]).  But whether these claims too are barred by the class action waiver was not the focus of Intuit's argument in the trial court and is not the focus on appeal either.

This leaves us nothing to review, and also takes the issue outside the scope of Intuit's own motion.

Third, the addition of the Sherman Act claims in this case does not constitute a de facto class action. Unlike the plaintiffs in the AT&T/T-Mobile merger cases, the consumers in this case have asserted federal antitrust claims *along with* their own state law-based claims seeking individual relief; thus, they are not seeking identical relief and cannot be viewed as a de facto class. (Cf. *Smith, supra,* 2011 U.S. Dist. Lexis 125367, at *16 [plaintiffs sought only "non-individualized relief"].)

Fourth, even if we were to assume that the consumers' state law-based claims seeking individual relief are severable from their Sherman Act claims, that the consumers' state law-based claims are properly moved to small claims court, and that the *only* claims the consumers have left in arbitration are the Sherman Act claims, Intuit is still not entitled to the relief it seeks—namely, the outright dismissal of the Sherman Act claims. Sherman Act claims may only be litigated in two fora— federal court or arbitration (*United States Golf Assn. v. Arroyo Software Corp.* (1999) 69 Cal.App.4th 607, 623-624 [exclusive federal court jurisdiction]); the terms of service requires claims to be arbitrated but Intuit is now seeking to push the claims out of arbitration and into oblivion. This is not allowed, because the FAA prohibits arbitration agreements that effectively eliminate a party's substantive statutory rights. (*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 637, fn. 19; *McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, 963.) Although Intuit insists on appeal that it is not trying to deny the consumers a forum, Intuit was more forthcoming with the trial court, going so

20

far as to argue that "the Sherman Act claims are not allowed to go forward."

## III. SB 707 Preemption

Intuit finally asserts that SB 707 is preempted by the FAA because the heavy penalties SB 707 mandates when an employer or business does not pay its arbitration fees in a timely fashion discourages arbitration, thereby thwarting the FAA's goal of encouraging arbitration.[7]  Preemption and the precursor issue of ripeness are both issues of law, and hence issues we independently review.  (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10 [preemption]; *Metropolitan Water Dist. of Southern California v. Winograd* (2018) 24 Cal.App.5th 881, 892 [ripeness].)  Intuit's SB 707-based claim is unlikely to succeed for two reasons.

First, the preemption issue Intuit presents is not ripe for adjudication.  To be ripe, a claim must be "'definite and concrete,'" and it must seek "'specific relief'" rather than "'an opinion advising what the law would be upon a hypothetical set of facts.'"  (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 171, quoting *Aetna Life Ins. Co. v. Haworth* (1937) 300 U.S. 227, 240-241.)  That standard is not met here. Intuit's primary argument that its preemption claim is ripe is that SB 707 puts it in a nearly impossible situation—either comply with SB 707 by timely paying arbitration fees even when there is a good chance no fees are owed because the arbitration should be taking place in small claims court *or* do not comply with SB 707 and face its statutory penalties.  In light of our resolution of Intuit's contract-based and "de facto" class action

---

[7]     The U.S. Chamber of Commerce filed an amicus curiae brief in support of Intuit on this issue.

claims, however, Intuit is not in this situation because it will have to pay arbitration fees no matter what:  Either *all* of the consumers' claims remain in arbitration or, at a minimum, the consumers' *Sherman Act* claims remain in arbitration.  Intuit is on the hook for the full amount of the arbitration fees either way.  Intuit tries to side-step this outcome by suggesting that the consumers' Sherman Act claims are somehow invalid because they were first asserted *after* Intuit requested that the arbitrations be administratively closed, but Intuit offers no argument, no law, and no facts to show why this timing matters.  Intuit never asserts that the consumers could not have filed entirely new demands for arbitration based on the Sherman Act even if Intuit's request for closure had been granted, such that arbitration fees would still be due.  Because Intuit is responsible for the arbitration fees no matter what, the only concrete harm that might arise from SB 707's penalties is if they were unfairly imposed under the circumstances of a particular arbitration.  But that has yet to happen, as Intuit has timely paid all of the initial arbitration fees that have come due.  Unless and until the facts have "'sufficiently congealed'" for a court to make an "'an intelligent and useful decision'" about whether SB 707's application *on specific facts* discourages arbitration, we would be issuing a "'purely advisory opinion[].'" (*Vandermost v. Bowen* (2012) 53 Cal.4th 421, 452.)

Second, even if we ignored the ripeness concerns, and even if we accepted Intuit's argument that SB 707 is preempted by the FAA, Intuit is still unlikely to succeed with its claim to halt the ongoing arbitrations.  That is because the invalidity of SB 707 would, at most, justify an injunction prohibiting the imposition of SB 707's statutory penalties in the event arbitration fees were

22

paid late; it would not justify an injunction halting the arbitrations altogether.

*    *    *

In light of our analysis, we have no occasion to consider whether the balance of the harms warrants interim relief for Intuit.  Moreover, because we affirm the trial court's order denying Intuit's motion for a preliminary injunction, we necessarily reject Intuit's request on appeal that *this court* issue an injunction halting all of the consumers' arbitrations.

**DISPOSITION**

The order is affirmed.  The consumers are entitled to their costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.

HOFFSTADT

We concur:

_____, P. J.

LUI

_____, J.

CHAVEZ

23